HELENE N. WHITE, Circuit Judge,
concurring in part and dissenting in part.
I agree with my colleagues’ disposition of the equal protection and free exercise claims, but respectfully dissent from the analysis and disposition of the as-applied equal-terms RLUIPA challenge. Whether the district court took too restrictive a view when it looked solely to secular schools as comparators is an open question in this Circuit. But assuming for argument’s sake that the district court erred in its choice of standard, the City of Upper Arlington is still entitled to summary judgment because Tree of Life Christian Schools did not identify a secular comparator similarly situated with respect to the relevant zoning criteria that received more favorable treatment under the challenged Unified Development Ordinance. Dist. Ct. Op., PID 2744 (citing Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty., 450 F.3d 1295, 1311 (11th Cir.2006)). Nor has it identified or argued that there are questions of fact that bear on this issue. I would affirm the grant of summary judgment to the City.
*374 I.
Upper Arlington (the City) is 10-miles square and almost 99% of its land is developed. Schools and churches are permitted in residential zones, which comprise 95% of developed land within the City.[1] Commercially-zoned districts comprise 4.7% of the land and include areas zoned Office and Research Center District (ORC), which constitute a minuscule 1.1% of the land.[2] Churches are permitted as conditional uses in ORC-zoned areas but all schools are prohibited.[3]
The City’s 2001 Master Plan, developed and implemented after lengthy study and seventeen public participation meetings at which residents gave input, notes that due to capital shortfalls,
in order for the City to maintain its existing level of facilities and services, and in order to provide for future capital needs, it is critical for the City to enhance its revenues. The revenue generated per acre from commercial use far exceeds the revenue provided by residential use. In order to maximize revenues, the City was directed in the Master Plan to create opportunities for office development that emphasize high-paying jobs-
PID 2731-32 (emphasis added). In keeping with the Master Plan, the City’s Unified Development Ordinance (UDO) describes the purposes of ORC zoning:
to allow offices and research facilities that will contribute to the City’s physical pattern of planned, healthy, safe, and attractive neighborhoods. The ORC district should also provide job opportunities and services to residents and contribute to the City’s economic stability.' Permitted uses generally include, but are not limited to, business and professional offices, research and development, book and periodical publishing, insurance carriers, corporate data centers, survey research firms, and outpatient surgery centers.
PID 1131/UDO art. § 5.04.
Against this backdrop, Tree of Life Christian Schools (TOLCS), a private religious school currently serving approximately 660 K-through-12 students and employing around 150 persons,[4] contracted in October 2009 to purchase from Time Warner the largest office complex in the City, 5000-05 Arlington Centre Boulevard — a 15.8-acre, 254,000 square-foot two-building center in an ORC-zoned district.[5]-
Although the City advised TOLCS months before it entered into the purchase agreement with Time Warner that schools are neither permitted nor conditional uses in the ORC and that site-specific rezoning *375 would be required in order to operate a school there, TOLCS applied to the City for a conditional use permit, requesting to use the office complex “for a place of worship, church and residential, to the extent that residential includes a private school.” After the City Council denied a conditional use permit, TOLCS sought to amend Table 5 of the UDO to allow private religious schools (but not other schools) as permitted uses in the ORC, and to change churches from conditional to permitted uses. The City Council denied TOLCS’s request for reasons including that amending the UDO to allow only private religious schools in ORC-zoned areas would “raise a facial First Amendment problem.” PID 2468, 2732.
The Time Warner-TOLCS purchase agreement contained a rezoning contingency period; nonetheless, TOLCS closed on the property on August 11, 2010, without seeking site-specific rezoning. TOLCS filed this action in January 2011.
In October 2013, TOLCS sought, for the first time, site-specific rezoning of its office complex from ORC to R-Sd (residential suburban).[6] The City’s Board of Zoning and Planning (BZAP) reviewed TOLCS’s rezoning request, after which the City Council considered it at three meetings in November and December 2013. By that point, this action had been pending for well over two years, the parties had taken some discovery, and the administrative record included evaluations of TOLCS’s prior requests.
City Staff reported to the City Council that the office complex now owned by TOLCS typically generated three types of income for the City: personal income tax on wages earned by employees (2%), entity-level income tax on net profits of company(ies) located there (2%), and property tax. The City’s Director of Finance Catherine Armstrong had previously testified that TOLCS’s office complex “is our largest commercial site and the income tax generated from this property has always been significant.” PID 1285, 1294. In 2001, the office complex generated 29% of the City’s income tax revenues; over $3,000,000. In 2005, the office complex generated revenue from personal and entity-level income taxes totaling $1,216,732, which decreased to $20,269 in 2009, the year Time Warner vacated the office complex. Property tax revenue to the City from the office complex increased from $584,917 in 2005 to $646,219 in 2009.
In 2010, TOLCS’s 150 or so employees combined earned $2,321,211.99,[7] which would translate to approximately $46,424 in personal income tax to the City, or about l/10th the income tax (personal and entity-level) Time Warner generated in 2006.
Rezoning would also substantially change the character of the ORC district by allowing single family homes and schools in an office and research zone, eliminating over 20% of the City’s existing ORC-zoned land, and permitting future *376 owners to demolish existing buildings, which would further reduce revenue to the City. PID 2614/City Staff Report to City Council 11/23/2013.
In addition to the financial aspects of the proposed rezoning, staff addressed .use concerns: •
A K-12 school has inherent characteristics which can be intrusive and destructive to an office park. Traffic, including school bus circulation, loading and unloading, can be challenging for an area to accommodate. A large number of young drivers and parents arriving and departing at similar (peak) times can tax the roadways and related infra-structure, reducing the level of service for the signalized intersections. After-school activities such as band and theater productions can also bring large numbers of parents and students to the area, often necessitating overflow parking demands. Outdoor events, such as band practice, can create noise impact for office workers who are attempting to do business and/or serve clients.
PID 2490.
The City Attorney reported to the City Council that TOLCS met none of the seven standards the UDO requires for rezoning (quoted below, followed by the City Attorney’s remarks in italics).
1.That the zoning district classification and use of the land will not materially endanger the public health or safety; [Finance Director Armstrong] testified in her deposition that the City had a decline in income in 2007, 2008, and 2009. The income in 2010 was comparable to the 2009 income and there was an increase in income in 2011. The City had a balanced budget during those years because appropriations were not requested that would exceed estimated revenues.
The elimination of the estate tax and reductions in state funding further reduces available revenues and places additional stress on a tight budget situation. In order to continue to provide necessary services to the residents, the City needs to maximize revenues. Rezoning the Tree of Life property to residential does not maximize the revenue potential of one of the City’s largest commercial office sites. The rezoning would permit a future owner to demolish the office buildings/school and build single family houses which would further reduce revenues.
2. That the proposed zoning district classification and use of the land is reasonably necessary for the public health or general welfare, such as by enhancing the successful operation of the surrounding area in its basic community function or by providing an essential service to the community or region;
The issue is not whether quality schools are necessary or if Tree of Life will be a good neighbor, but whether the City needs more residen-tially zoned land. Approximately 90% of the City ... is already zoned for residential uses, including schools. Tree of Life has failed to establish the necessity for more residentially zoned land.
3. That the proposed zoning district classification and use of the land will not substantially injure the value of the abutting property;
Tree of Life’s argument concerning St. Andrews and Wellington [both schools] are an “apples to oranges” comparison. Both ... are located in purely residential districts that specifically contemplate schools. Tree of Life proposes to put a school in an *377 office and retail district that does not contemplate such a use. Abutting commercial owners could not have anticipated such a school use possible when they acquired their properties.
4. That the proposed zoning district classification and use of the land will be in harmony with the scale, bulk, coverage, density, and character of the area the neighborhood [sic] in which it is located;
The AOL office workers were in harmony with the commercial character of the Henderson Road corridor. Residential uses, including 600 students attending a K-12 school, are not
5. That the proposed zoning district-classification and use of the land will generally conform with the Master Plan and other official plans of the City;
Rezoning to eliminate commercially zoned property is contrary to the Master Plan [which] seeks to “Enhance the City’s revenue sources” and “Expand the amount of office space in the City”.[sie] Tree of Life is asking Council to eliminate over 20% of the City’s existing ORC zoned land. Commercial office comprises only 1.1 percent of the City’s total land area. Zoning should be based on a comprehensive plan taking into consideration the best interests of the community. It should not be done on a piecemeal based on the desires of an individual property owner.
6. That the proposed zoning district classification and use of the land are appropriately located with respect to transportation facilities, utilities, fire and police protection, waste disposal, and similar characteristics; and The revised traffic study is still deficient in addressing the change in traffic conditions resulting from a school. Staff is also concerned whether adequate study has been made if the property were redeveloped for residential or other uses permitted in the R-Sd district.
7.That the proposed zoning district classification and use of the land will not cause undue traffic congestion or create a traffic hazard.
It is questionable whether Tree of Life’s promise that no athletic events or evening activities would be held at the site would be enforceable.
UDO § 4.04(c) (emphasis added)/PID 2391; 12/9/13 City Council Mtg. Minutes/PID 2578-79.
The City Council denied TOLCS’s rezoning request, which prompted the parties to file cross-motions for summary judgment, the disposition of which led to this appeal.
II.
RLUIPA’s equal terms provision provides: “No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less then equal terms with a nonreligious assembly or institution.” 42 U.S.C. § 2000cc(b)(l). This statutory command ... “ ‘allows courts to determine whether a particular system of classifications adopted by a city subtly or covertly departs from requirements of neutrality and general applicability.’” Primera Iglesia, 450 F.3d at 1307 (quoting Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1232 (11th Cir.2004) (emphasis added)).
To establish a prima facie case under the equal terms provision, a plaintiff has the burden of showing that 1) it is a religious assembly or institution, 2) subject to a land use regulation, that 3) treats it on *378 less than equal terms, with 4) a nonreligious assembly or institution. Primera Iglesia, 450 F.3d at 1307. It is TOLCS’s burden to identify a similar secular comparator treated more favorably under the UDO. Id. at 1313-14 (Noting that “without identifying a similarly situated nonreligious comparator that received favorable treatment, Primera failed to establish a prima facie Equal Terms violation.”).
A.
As TOLCS acknowledges on appeal, the circuits generally are in accord “that valid comparators for RLUIPA purposes are secular assemblies or institutions that impact the accepted zoning criteria, or regulatory purpose, to the same or greater extent than the religious assembly or institution at issue.” Reply Br. 8. See Eagle Cove Camp & Conference Ctr. Inc. v. Town of Woodboro, Wi, 734 F.3d 673, 683 (7th Cir.2013) (“In determining whether a claim exists under the equal terms provision, we look to the zoning criteria rather than the purpose behind the land use regulation”) (citing River of Life Kingdom Ministries v. Village of Hazel Crest, Ill., 611 F.3d 367, 371 (7th Cir.2010) (en banc)); Centro Familiar Cristiano v. City of Yuma, 651 F.3d 1163 (9th Cir.2011) (observing that “our analysis is about the same as the Third Circuit’s: we look to see if the church is ‘similarly situated as to the regulatory purpose’ ” or to the Seventh Circuit’s refinement of the regulatory purpose test “to avoid inappropriate subjectivity by requiring equality with respect to ‘accepted zoning criteria,’ such as parking, vehicular traffic, and generation of tax revenue.”); Third Church of Christ v. City of New York, 626 F.3d 667, 670 (2d Cir.2010) (church and two secular institutions were similarly situated “for all functional intents and purposes relevant here.”); River of Life Kingdom Ministries, 611 F.3d at 371 (“The problems ... with the 3d Circuit’s test can be solved by a shift of focus from regulatory purpose to accepted zoning criteria. ‘Purpose’ is subjective and manipulate ... ‘Regulatory criteria’ are objective-and it is federal judges who will apply the criteria to resolve the issue.”); Lighthouse Inst. for Evangelism, 510 F.3d 253, 266 (3d Cir.2007) (comparator must be similarly situated). But see Elijah Group v. City of Leon Valley, 643 F.3d 419, 424 (5th Cir.2011) (declining to. adopt the test of any other circuit and holding that RLUIPA’s equal terms provision “must be measured by the ordinance itself and the criteria by which it treats institutions differently.”), and Primera Iglesia, 450 F.3d 1295 (11th Cir.2006) (comparators are determined based on whether challenged ordinance is facially neutral or facially discriminatory; if the latter, any nonreligious assembly or institution can be a comparator and strict scrutiny applies. If the challenged ordinance is facially neutral, however, claims are classified as either 1) those that challenge ordinances of general applicability but that nonetheless target religion through a religious gerrymander, or 2) those that challenge discriminatory application.) [8]
The parties did not attempt to resolve the legal standard below; nor do they do so on appeal. Each maintains that it prevails under any of the standards. Further, TOLCS does not challenge the City’s zon *379 ing criteria; rather, it argues that it is treated unfavorably compared to similarly situated comparators with respect to those criteria. Finally, neither party argued to the district court, and neither argues on appeal, that there are questions of fact with regard to the various uses or zoning criteria that preclude summary judgment.
B. Similarly Situated Comparators
TOLCS acknowledged below that secular schools are proper comparators, and does not dispute the district court’s determination that the UDO treats all schools equally, i.e., prohibits all schools in ORC districts. It also acknowledges that churches are permitted as conditional uses in ORC districts. TOLCS’s argument is that while secular schools are proper comparators, they are not the only proper comparators, and the district court erred in not considering day-care centers, charitable office uses, and hospitals as additional comparators, which, it asserts, are similarly situated with respect to the zoning criteria but treated more favorably.[9]
In September 2011, after TOLCS brought the instant action, the City Council passed an ordinance amending the UDO to remove daycare centers from the category of permitted uses and designate them as prohibited uses in the ORC district. TOLCS asserts that the district court erred in not considering daycares as a valid comparator because its damages claim cannot be mooted by the City’s voluntary cessation of unlawful conduct, and because the amended UDO still violates RLUIPA by allowing hospitals and nonprofit uses in the ORC district. The City asserts that daycare centers are not a proper comparator because they are no longer allowed, but even assuming they are, they are not similarly situated with respect to the relevant zoning criteria. We turn to that question.
1. Child Day-Care Centers
The UDO defines “Child Day-Care” as:
administering to the needs of infants, toddlers, preschool children and school children outside of school hours by persons other than their parents or guardians, custodians or relatives by blood, marriage, adoption, for any part of the 24 hour day in a place or residence other than the child’s own home.
PID 1025. Child Day Care may be provided at a permanent residence or other location:
Child Day-Care Center and Type A Home: means any place in which child day-care is provided, with or without compensation, for IS or more children at one time, or any place that is not the permanent residence of the licensee or administrator in which child day-care is provided, with or without compensation, for seven to 12 children at one time. In counting children for the purpose of this ordinance, any children under six years of age who are related to a licensee, administrator, or employee and who are on the premises of the center shall be counted.
*380 Child Day-Care Home and Type B Home: means a permanent residence of the provider in which child day-care services are provided for one to six children at one time and in which no more than three children may be under two years of age at one time. In counting children for the purpose of this ordinance, any children under six years of age who are related to the provider and who are on the premises of the Type B home shall be counted. A Type B family day-care home does not include a residence in which the needs of children are administered to, if all of the children are siblings of the same immediate family and the residence is the home of the siblings.
PID 1026.
TOLCS’s reliance on the testimony of Senior Planning Officer Gibson and Robert Weiler, one of the City’s experts, to support that child day-care centers are similarly situated to its 660-student school because some centers would not maximize tax revenue to the City, is unavailing. Both Gibson and Weiler testified or averred that, in keeping with the UDO’s description of ORC zoning as including “services,” day-care centers were permitted as ancillary, complementary services in support of primary uses like offices, not because they generate significant tax revenue for the City in and of themselves. Similarly, coffee and barber shops are permitted uses in the ORC as ancillary uses.[10]
Weiler explained:
Although daycares are not significant revenue producers, daycares compliment [sic] a commercial use by providing child supervision for employees in the area. In addition, the surveyed daycares in the city of Upper Arlington serve only between 40 to 130 children. Additionally] having built and owned daycares including a current interest in a daycare located on Sawmill Road in Columbus, few daycares are in excess of 10,000 SF as compared to [] school[s] that are routinely substantially larger.
PID 1765. A 600-student K-12 school is not an ancillary service for the convenience and support of the employees who work in the area’s offices and commercial establishments
TOLCS also asserts that day-care centers are proper comparators because some are large and licensed to accept as many as 1,000 children. Appellant Br. 12-13, n. 4. It relies on two exhibits, the first[11] of which lists six day-care centers located in *381 Arizona, Missouri, Kansas, and South Carolina that “care for children outside of school hours” and have capacity to serve from 416 to 965 children. The second exhibit consists of charts listing the twenty-five largest day-care centers in Ohio, which have capacities to serve from 282 to 467 children. But TOLCS points to no day-care facilities in the City or the immediate area. The size of the six day-care centers in four states far from Ohio seems no more relevant than the size of day-care centers in Europe. Similarly, the list of the largest day-care centers in Ohio provides no information about the communities they serve, other than their names. The City is entitled to devise a master plan and ordinances that take into account the size of the community and its actual experience with commercial and other users of land.
Additionally, most of the twenty-five largest Ohio day-care centers TOLCS offered are named either “school,” “learning center,” “child development center,” “head start,” or “children’s center,” suggesting that the facilities provide both day-care and schooling. Assuming these centers would have qualified as child day-care centers permitted under the UDO, TOLCS failed to present evidence that any daycare comparator seeking to locate in the City’s ORC would serve anywhere near the 660 students TOLCS serves (it is un-controverted that the largest day-care center in the City served 130 children). TOLCS’s proposed 660-student K-through-12 school would constitute a much more intensive use than a day-care center by virtue of its size, the age range of its students, and the traffic and noise it would generate during peak times and during after-school and weekend activities. In sum, TOLCS failed to show that the daycare comparators are similarly situated with respect to the accepted zoning criteria, and are no more consistent with office use, research use, supporting commercial activities, and supporting, ancillary, services than TOLCS.
2. Hospitals
TOLCS asserts that hospitals are proper comparators because some hospitals in the Columbus area are nonprofit and do not generate property tax for the City, Appellant Br. 13, 36, and therefore inclusion of hospitals in the ORC undermines the City’s objective of generating revenue. But TOLCS overlooks that income tax, not property tax, is the largest source of revenue for the City, and hospitals typically employ many highly-skilled and educated professionals who tend to command large salaries. Thus, that some hospitals are non-profit and do not pay real-estate taxes is unimportant when compared to the revenue non-profit hospitals generate in income taxes. Appellee Br. 25.
The majority observes that “we cannot assume as a fact, and the government certainly has offered no evidence to show, that an ambulatory care center (or an outpatient surgery center ... ) ... would employ higher-income workers” than TOLCS. Maj. Op. at 371-72. I disagree for two reasons. First, the majority discounts the City’s institutional knowledge of which land uses generate most revenue for the City. Second, it is TOLCS’s burden to come forward with a similarly situated comparator, Primera Iglesia, 450 F.3d at 1311, and TOLCS offered no evidence that it would generate comparable to that generated by a hospital or medical center, nonprofit or not. Further, TOLCS does not argue that questions of fact should have precluded summary judgment or that we should remand for further factual development.
3. Charitable Offices
Finally, TOLCS asserts that charitable offices generate no property tax and that *382 nothing in the UDO would preclude a charitable organization from staffing an office, say, with only twenty employees, which would not generate much income tax for the City. Appellant Br. 13, 36. But the density of non-profit office use and the salaries of non-profit professionals are more compatible with the ORC’s permitted uses and economic goals than a K-12 school and its accompanying noise and traffic.
IV.
In sum, the majority requires not equal treatment, but special treatment, for the proposed religious use. See, e.g., Primera Iglesia, 450 F.3d at 1313-14 (citing Midrash, 366 F.3d at 1231-32, and Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 762 (7th Cir.2003) (“[N]o ... free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise.”)) I would affirm the grant of summary judgment to Upper Arlington on the basis that TOLCS failed to present a secular comparator that is similarly situated with respect to the relevant zoning criteria.[12] See, e.g., Eagle Cove Camp & Conference Cir. Inc., 734 F.3d at 683; Centro Familiar Cristiano, 651 F.3d at 1172-73.

. See Land Use Map, PID 149, and District Court Opinion, PID 2743.

. The City is approximately 6,336 acres and ORC-zoned districts occupy only 67 acres.

. Schools are prohibited in the ORC and all other commercially-zoned districts. The other commercial districts are the Office District (O), Neighborhood Business District (B-l), Community Business District (B-2), Conditional Business District (B-3), and Planned Shopping Center District (PB-3). Churches are permitted or conditional uses in commercial districts B-l, B-2, PB-3, O, and ORC.

. TOLCS asserted that it employed 150 persons, and the district court used that figure in its opinion. Subsequently, however, TOLCS's counsel represented to the City’s Board of Zoning Appeals that TOLCS employs 100 persons. PID 2227, 2635/supplemental record filed with leave following this court's remand.

. The property TOLCS purchased has been zoned commercial since 1970. Time Warner purchased the property in 2006 for $23 million dollars. TOLCS purchased the office complex from Time Warner for $6.5 million dollars.

. The purpose of R-S residential zoning
is to allow single-family dwellings in low-density residential neighborhoods. This district is further subdivided into four sub-districts R-Sa, R-Sb, R-Sc, and R-Sd, differing primarily in required lot area and yard space. Net densities range from 0.33 dwelling units per acre in the R-Sa District to 2 dwellings per acre in the R-Sd District. Permitted uses generally include, but are not limited to, single-family residential, institutional, cultural, recreation, and day care.
PID 2524/UDO § 5.02(A)(1).

. TOLCS Superintendent Dr. Todd Marrah also projected that if TOLCS occupies the office complex, the student population could increase to 1300 and employees to 250, but he was not asked to project total employee wages should personnel exceed 150.

. The majority’s references to the Eleventh Circuit’s test for determining comparators, Maj. Op. at 367 and 369-70, are unnecessary given that TOLCS does not argue for application of that test. TOLCS simply argues that, contrary to the district court’s determination that only secular schools are proper comparators to TOLCS, none of the circuits (including the Eleventh Circuit) require that secular comparators be identical to the religious plaintiff, only similarly situated. Appellant Br. 22, 24.

. TOLCS asserts that the "fatal flaw” in the City's attempts to distinguish it from day-care centers, charitable office uses, and hospitals, is that
the City’s desire to maximize tax revenue from the use of Tree of Life’s property translates to nothing more than a vague set of hopes and dreams. The City ... created the ORC district in the hopes that it would generate tax revenue for the City but it drafted the district requirements in an imprecise, overly broad, and impractical way that allows for uses in the ORC district that undercut its stated purpose and criteria to the same or greater extent than Tree of Life’s use.
Reply Br. 15.

. UDO § 5.01(B) provides that only uses designated as permitted shall be allowed as a matter of right in a zoning district and any not so designated shall be prohibited ... PID 2008. Schools are not designated as permitted in the ORC and are thus prohibited.
ORC uses designated as permitted include banks, business and professional offices, corporate data centers, hotels and motels, hospitals, insurance carriers, outpatient surgery centers, periodicals and book publishing, research and development in information or medical technologies, survey research firms, barber shops and beauty parlors, and coffee shops.
Expressly prohibited ORC uses include adult book stores, adult motion-picture theaters, amusement arcades, animal boarding, automotive service establishments, bowling alleys, candy stores, pool or billiard rooms, department stores, drug stores, dry-cleaning shops, fast-food restaurants, funeral homes, grocery and supermarket stores, laundromats, liquor stores, massage parlors, meat and fruit markets, motor-vehicle wash facilities, movie theaters, night clubs, pharmacies, publishing, radio and TV studios, skating rinks, soda fountains, variety stores, and tattoo parlor or body-piercing studios.

. See PID 115, the declaration of a legal assistant at the Alliance Defense Fund who avers that she conducted research regarding the size of day-care centers across the country.

. I further observe that the majority's discussion of eminent domain is inapposite. TOLCS purchased the property with knowledge of the existing zoning, and the City has no obligation to compensate TOLCS as a condition of its enforcement of its valid zoning regulations. TOLCS has not shown that there are no feasible uses for the property. Indeed, it derives income by leasing out a portion of the space.