POSNER, Circuit Judge.
The court granted rehearing en banc to consider the proper standard for applying the equal-terms provision of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc. That provision states that “no government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.” § 2000cc(b)(l).
The appellant, River of Life, is a small church (it has 67 members, only about half of whom attend services on an average Sunday) that at present operates out of rented space in a cramped, dirty warehouse in Chicago Heights, a town 27 miles south of downtown Chicago. It wanted to relocate to a building in the Village of Hazel Crest, a town of some 15,000 people located two miles north and slightly west of Chicago Heights. The building, however, is in a part of the town designated by the town’s zoning ordinance as a commercial district. The district is in the town’s oldest part, which is run down; indeed the entire town has been in economic decline for years. The area designated as a commercial district is close to the train station, and the presence of commuters might enable the district to be revitalized as a commercial center. The zoning ordinance has therefore been amended to exclude new noncommercial uses from the district, including not only churches but also community centers, schools, and art galleries.
River of Life sued the Village under the equal-terms provision and moved for a preliminary injunction against the enforcement of the zoning ordinance. The district judge denied the motion and a panel of this court affirmed, mainly on the ground that the church was unlikely to prevail when the case was fully litigated. 585 F.3d 364 (7th Cir.2009). The existence of an intercircuit conflict with respect to the proper test for applying the equal-terms provision, combined with uncertainty about the consistency of our decisions, persuaded the full court to hear the case in order to decide on a test.
Two of our sister courts of appeals have proposed tests. The Third Circuit in Lighthouse Institute for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 266 (3d Cir.2007), ruled that “a regulation will violate the Equal Terms provision only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated as to the regulatory purpose” (emphasis in original). The court must identify first the goals of the challenged zoning ordinance and second the secular assemblies (meeting places) that are comparable to the plaintiffs religious assembly in the sense of having roughly the same relation to those goals. If the reasons for excluding some category of secular assembly— whether traditional reasons such as effect on traffic or novel ones such as creating a *369 “Street of Fun,” see, e.g., Clifton Hill, “Fun by the Falls,” www.cliftonhill.com (visited May 25, 2010) — are applicable to a religious assembly, the ordinance is deemed neutral and therefore not in violation of the equal-terms provision. But if a secular assembly is allowed and the religious assembly banned even though the two assemblies don’t differ in any way material to the regulatory purpose behind the ordinance, then neutrality has been violated and equality denied. That was the situation in the Lighthouse case. The zoning ordinance permitted meeting halls in the district in which the church wanted to locate and there was no way to distinguish between meeting halls and churches on the basis of the purpose of the ordinance. The Third Circuit therefore ordered summary judgment in favor of the church with respect to its challenge to the ordinance (though not its challenge to a newer redevelopment plan), saying that “Long Branch [the defendant] has failed to create a genuine issue of material fact as to whether the Ordinance treated religious assemblies or institutions on less than equal terms with non-religious assemblies or institutions that caused equivalent harm to its governmental objectives.” 510 F.3d at 272-73.
An alternative test was adopted by the Eleventh Circuit in Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1230-31 (11th Cir.2004), and followed in Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County, 450 F.3d 1295, 1308-10 (11th Cir.2006), and Konikov v. Orange County, 410 F.3d 1317, 1324-29 (11th Cir.2005) (per curiam). The Eleventh Circuit reads the language of the equal-terms provision literally: a zoning ordinance that permits any “assembly,” as defined by dictionaries, to locate in a district must permit a church to locate there as well even if the only secular assemblies permitted are hospital operating theaters, bus terminals, air raid shelters, restaurants that have private dining rooms in which a book club or professional association might meet, and sports stadiums. In Midrash the court held that where private clubs are allowed, so must churches be.
Pressed too hard, this approach would give religious land uses favored treatment — imagine a zoning ordinance that permits private clubs but not meeting halls used by political advocacy groups. The court indicated, however, that a seemingly unequal treatment of religious uses that nevertheless is consistent with the “strict scrutiny” standard for determining the propriety of a regulation affecting religion would not violate the equal-terms provision. Midrash Sephardi, Inc. v. Town of Surfside, supra, 366 F.3d at 1232.
Our own cases dealing with that provision had cited Midrash without criticism but had not been centrally concerned with the interpretive issue presented in this case. In Digrugilliers v. Consolidated City of Indianapolis, 506 F.3d 612, 616-17 (7th Cir.2007), the issue was whether by granting churches rights that, though unlikely to be exercised, would conflict with rational zoning policy, a municipality could exclude churches from a district in which otherwise similar secular assemblies were permitted; we held it could not. In Vision Church v. Village of Long Grove, 468 F.3d 975, 1002-03 (7th Cir.2006), which we decided against the church plaintiff, the restaurants and health clubs that the church considered comparable land users that were treated more favorably than it was were located in a commercial district rather than in the residential district in which the church sought to build, and “the fact that [the church] and the elementary schools [which the church also contended were comparable, and which were permitted under a prior city ordinance but would have been excluded under the current or *370 dinance] were subject to different standards because of the year in which their special use applications were considered compels the conclusion that there was no unequal treatment.” Id. at 1003.
Neither the Third Circuit’s nor the Eleventh Circuit’s approach, though in application they might yield similar or even identical results — and results moreover that would strike most judges as proper — is entirely satisfactory. We are troubled by the Eleventh Circuit’s rule that mere “differential treatment” between a church and some other “company of persons collected together in one place ... usually for some common purpose” (the court’s preferred dictionary definition of “assembly”) violates the equal-terms provision. Midrash Sephardi, Inc. v. Town of Surfside, supra, 366 F.3d at 1230-31. “Assembly” so understood would include most secular land uses — factories, nightclubs, zoos, parks, malls, soup kitchens, and bowling alleys, to name but a few (visitors to each of these institutions have a “common purpose” in visiting) — even though most of them have different effects on the municipality and its residents from a church; consider just the difference in municipal services required by different land uses, including differences in the amount of police protection. The land use that led the Eleventh Circuit in Midrash to find a violation of the equal-terms provision was, however, a private club, and it is not obvious that it has different effects on a municipality or its residents from those of a church. Thus our quarrel is not with the result in Midrash but with the Eleventh Circuit’s test.
A subtler objection to the test is that it may be too friendly to religious land uses, unduly limiting municipal regulation and maybe even violating the First Amendment’s prohibition against establishment of religion by discriminating in favor of religious land uses. See Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895, 900 (7th Cir.2005). The Supreme Court had held in Employment Division v. Smith, 494 U.S. 872, 878-80, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), that the clause of the First Amendment that guarantees the free exercise of religion does not excuse churches from having to comply with nondiscriminatory regulations, such as the prohibition of drugs believed to be dangerous, even if the regulation interferes with church rituals or observances: “we have never held that an individual’s religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate.” Id. at 878-79, 110 S.Ct. 1595. If they were excused, this might be deemed favoritism to religion and thus violate the establishment clause.
Suppose a zoning ordinance forbids all assemblies except gymnasiums. Then because a gymnasium is an assembly as defined by the Eleventh Circuit, a church could locate in the district but a secular humanist reading room could not, unless secular humanist organizations (such as American Atheists, the American Humanist Association, the Freedom From Religion Foundation, the Godless Americans Political Action Committee, Internet Infidels, and the Skeptics Society — these are all real organizations) were defined as religions. (Nor could the local chapter of the Cat Fanciers’ Association, which might have 67 dues-paying local members, only about half of whom show up on average at the chapter’s meetings.) It was to avoid making its test overprotect religious assembles in comparison to their closest secular counterparts that the Eleventh Circuit added its “strict scrutiny” gloss— municipalities can bar religious land uses from particular zones if the regulation satisfies the “strict scrutiny” test for regulations that treat religious and secular activities differently. There is no textual basis *371 for the gloss, and religious discrimination is expressly prohibited elsewhere in the statute. The gloss was needed only to solve a problem of the court’s own creation.
A further objection to the Eleventh Circuit’s test is that “equality,” except when used of mathematical or scientific relations, signifies not equivalence or identity but proper relation to relevant concerns. It would not promote equality to require that all men wear shirts that have 15-inch collars, or that the number of churches in a state equal the number of casinos, or that all workers should have the same wages. But it does promote equality to require equal pay for equal work, even though workers differ in a variety of respects, such as race and sex. If a church and a community center, though different in many respects, do not differ with respect to any accepted zoning criterion, then an ordinance that allows one and forbids the other denies equality and violates the equal-terms provision.
This understanding of the equal-terms provision is imperfectly realized by the Third Circuit’s test as well. That test centers on identifying the zoning authorities’ “regulatory purpose” in adopting an ordinance that excludes a church. Our concern is not that the equal-terms provision as drafted by Congress omits the term “regulatory purpose” or some cognate term. As we explained, “equality” is a complex concept. The fact that two land uses share a dictionary definition doesn’t make them “equal” within the meaning of a statute. But the use of “regulatory purpose” as a guide to interpretation invites speculation concerning the reason behind exclusion of churches; invites self-serving testimony by zoning officials and hired expert witnesses; facilitates zoning classifications thinly disguised as neutral but actually systematically unfavorable to churches (as by favoring public reading rooms over other forms of nonprofit assembly); and makes the meaning of “equal terms” in a federal statute depend on the intentions of local government officials. Midrash Sephardi Inc. v. Town of Surfside, supra, 366 F.3d at 1231.
That was our point in Digrugilliers v. Consolidated City of Indianapolis, supra, 506 F.3d at 615, when we rejected the argument that a city “could exclude churches from districts zoned residential by ordaining that a residential use of land does not include the grazing of sheep but a religious use does, and therefore the federal Act does not require the City to permit churches in residential zones, as to do so would give churches more rights than the other users of land in those zones have. Such an approach — in effect defining ‘religious assembly or institution’ as a church plus a sheep farm — would be bootstrapping.”
The problems that we have identified with the Third Circuit’s test can be solved by a shift of focus from regulatory purpose to accepted zoning criteria. The shift is not merely semantic. “Purpose” is subjective and manipulable, so asking about “regulatory purpose” might result in giving local officials a free hand in answering the question “equal with respect to what?” “Regulatory criteria” are objective — and it is federal judges who will apply the criteria to resolve the issue.
So let us consider those criteria, noting by way of background that originally zoning was “cumulative” — -that is, “higher uses,” such as residential land uses, were permitted in districts in which “lower uses,” such as manufacturing, were permitted, though the “lower uses” were excluded from districts zoned for the higher ones. Cumulative zoning soon gave way to noncumulative (or “exclusive”) zoning, in which specified land uses were confined to *372 specified districts and thus could be and often were separated. See, e.g., State ex rel. Berndt v. Iten, 259 Minn. 77, 106 N.W.2d 366, 368-69 (1960); McDonough v. Apton, 48 A.D.2d 194, 368 N.Y.S.2d 603, 608-09 (NY.App.Div.1975); Grubel v. MacLaughlin, 286 F.Supp. 24, 28-29 (D.Vi.1968); Daniel R. Mandelker, Land Use Law § 5.43 (5th ed.2003). As explained in People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove, 16 Ill.2d 183, 157 N.E.2d 33, 36 (1959), “the dangers of heavy traffic are greater in mixed residential-industrial or residential-commercial districts than in districts devoted to just one purpose. Industrial and commercial districts are not good places to bring up families from a health standpoint; and the presence of children in and about industrial and commercial districts leads to a demand for school, park and play-ground facilities in an area where there is either no land available or the land available is ill-suited to such uses. In short, whether industry and commerce are excluded from the residential areas, or residences from industrial and commercial areas, it is not unreasonable for a legislative body to assume that separation of the areas would tend in the long run to insure a better and a more economical use of municipal services, such as schools, providing police protection, preventing and fighting fires, and better use of street facilities. The general welfare of the public may be enhanced if industry and commerce are provided with a favorable climate. The sale of a few lots at important points in a district may make industrial or commercial expansion impossible or prohibitively expensive. To protect the residents in the district, traffic may be slowed down unduly and thus detract from the efficiency of production and trade. In final analysis, it seems clear that industry and commerce are also necessary and desirable and that a proper environment for them will promote the general welfare of the public.”
Or as Patricia E. Salkin, American Law of Zoning § 9:15 (5th ed.2010), explains with specific reference to commercial districts: “All commercial uses are not created equal. Some require pedestrian traffic; others create hazards for pedestrian traffic. Some commercial uses cause pedestrian traffic during the daylight hours; others operate at night and are quiet in the daytime. The list of characteristics could be extended, but this small sample suggests that residential uses in commercial neighborhoods will injure, as well as be injured by, the adjacent commercial uses. And it suggests further that some commercial uses will be incompatible with others.... The most common drafting answer to the problems sketched above is the ‘exclusive’ zoning ordinance.... Districts are established for named uses, or groups of uses, and all others are excluded. The chief virtue of such ordinances is that they create districts for commerce and industry, and exclude from such districts residential and other uses which are capable of interfering with the planned use of land.”
And in like vein we read in Harry B. Madsen, “Noncumulative Zoning in Illinois,” 37 Chi-Kent L.Rev. 108, 113-14 (1960), that “if municipalities wish to retain their commercial and industrial tax plums they must compete with the advantages to be gained in the wide open spaces where the car-pools flow freely. Commerce and industry must be recognized for what they are, necessary and desirable elements of the community.... [M]uch of the exodus of commerce and industry would be checked by reasonable security that an already bad situation would not get worse. The noncumulative zoning ordinance is peculiarly well suited to provide this security.”
*373 Exclusion of churches from a commercial zone (though generally not from every commercial zone in the municipality), along with other noncommercial assemblies, such as exhibition halls, clubs, and homeless shelters, is thus not unique to the Village of Hazel Crest. See, e.g., Fairfield, California Municipal Code, art. I, § 25.22.2(A), tab. 25-9, www. co depublishing, com/ca/fairfield/html/fairfield25/ fairfield2522.html; Village of Lincolnwood, Illinois Zoning Code tab. 4.01.1, www.ecode360.com/documents/LI3005/ Chapter% 2016% 20-% 20Zoning% 20Ordi-nance.pdfiSkokie, IllinoisZoningOrdinance, ch.118, App. A, library.munieode.com/ HTML/13819/level2/Cl 18 — AA.html; North Beach, Maryland Zoning Ordinance, art. Ill, § 3-200 tab. 1, www.ci.northbeach.md.us/Pages/ NorthBeaehMD_Zoning/zoning/artiele3.pdf (all visited May 25, 2010).
A reader might worry that “commercial” is a synonym for “secular.” It is not. There are many secular noncommercial land uses, and if the Village of Hazel Crest were concerned for example about the sufficiency of parking space in some part of the village, the commercial or noncommercial character of land uses that generated similar vehicular traffic flows would be irrelevant. Suppose maintenance of regular (as opposed to sporadic and concentrated) vehicular traffic were the zoning objective. From that standpoint, a church is more like a movie theater, which also generates groups of people coming and going at the same time, than like a public library, which generates a smoother flow of traffic throughout the day. The equal-terms provision would therefore require the zoning authorities to allow the church in the zone with the movie theater because the church was more like the for-profit use (the movie theater) than the not-for-profit use (the public library).
Parking space and traffic control are not the only concerns of land-use regulation. Another is generating municipal revenue and providing ample and convenient shopping for residents, and can be promoted by setting aside some land for commercial uses only, which generate tax revenues. Hazel Crest has therefore created a commercial district that excludes churches along with community centers, meeting halls, and libraries because these secular assemblies, like churches, do not generate significant taxable revenue or offer shopping opportunities. See Robert C. Ellickson & Vicki L. Been, Land Use Controls: Cases and Materials 90-91 (3d ed.2005). Similar assemblies are being treated the same. The permitted land use that is most like the plaintiffs is a commercial gymnasium, and that’s not close enough because a commercial assembly belongs in an all-commercial district and a noncommercial assembly, secular or religious, does not.
Of course we can’t be certain, or even confident, that a particular zoning decision was actually motivated by a land-use concern that is neutral from the standpoint of religion. But if religious and secular land uses that are treated the same (such as the noncommercial religious and secular land uses in the zoning district that River of Life wants to have its church in) from the standpoint of an accepted zoning criterion, such as “commercial district,” or “residential district,” or “industrial district,” that is enough to rebut an equal-terms claim and thus, in this case, to show that River of Life is unlikely to prevail in a full litigation. (Another section of the ordinance-section 8.1(c), which provides that “no church services may be conducted in any building designed for a business use”' — • appears not to be at issue.)
Indeed, this case is straightforward because, after the amendment to its zoning *374 ordinance, Hazel Crest really was applying conventional criteria for commercial zoning in banning noncommercial land uses from a part of the village suitable for a commercial district because of proximity to the train station. We are likely to have cases in the future challenging zoning ordinances that are harder to classify, as variances and special-use permits and grandfathered nonconforming uses blur the character of particular zoning districts. But should a municipality create what purports to be a pure commercial district and then allow other uses, a church would have an easy victory if the municipality kept it out.
If the test we are adopting seems less than airtight, bear in mind that the equal-terms provision is not the only or even the most important protection against religious discrimination by zoning authorities. (Think of the religious clauses of the First Amendment.) It is not even the only protection in the Religious Land Use and Institutionalized Persons Act. For the Act provides that a land-use regulation “that imposes a substantial burden on the religious exercise of a ... religious assembly or institution” is unlawful “unless the government demonstrates that imposition of the burden ... is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000cc(a)(1); see World Outreach Conference Center v. City of Chicago, 591 F.3d 531, 537-38 (7th Cir.2009); Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, supra, 396 F.3d at 901; Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 352-53 (2d Cir.2007). And it further provides that “no government shall impose or implement a land use regulation in a manner that discriminates against any assembly or institution on the basis of religion or religious denomination,” § 2000cc(b)(2); see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533-37, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); Bloch v. Frischholz, 587 F.3d 771, 783-87 (7th Cir.2009) (en banc), or that “totally excludes religious assemblies from a jurisdiction.” § 2000cc(b)(3)(A). But as none of these other provisions is before us on this appeal, the appeal must fail.
Affirmed.