RONALD LEE GILMAN, Circuit Judge.
This case arises out of a zoning dispute between Tree of Life Christian Schools *361 (Tree of Life) and the City of Upper Arlington, Ohio. In 2001, Upper Arlington adopted a Master Plan to guide its zoning decisions. The Master Plan emphasizes the need to increase the City's revenue by attracting business development in the small portion of the City's land that is devoted to commercial use. To further the Master Plan's goals, Upper Arlington's Unified Development Ordinance (Development Ordinance) restricts the use of areas zoned as an office-and-research-center district (office district) to specific uses that are primarily commercial. The operation of schools, both secular and religious, is a prohibited use within the office district.
Despite this prohibition, Tree of Life decided in 2010 to purchase a large office building on a 16-acre tract of land that is located within the office district (the Property) for the purpose of operating a pre-K through 12th-grade school. After failing to secure authorization from Upper Arlington to operate a school on the Property, Tree of Life filed suit in the United States District Court for the Southern District of Ohio, arguing, among other things, that the Development Ordinance violates the "equal terms" provision of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc(b)(1), by treating the school less favorably than comparable nonreligious land uses.
After two prior appeals to this court, the parties filed cross-motions for final judgment. The district court granted Upper Arlington's motion and denied Tree of Life's, holding that the Development Ordinance is no more onerous to Tree of Life than it is to nonreligious entities that generate comparably small amounts of revenue for the City. Because Tree of Life has not established a prima facie case under RLUIPA's equal terms provision, we AFFIRM the judgment of the district court.
I. INTRODUCTION
A. Factual background
1. Upper Arlington's land-use policies
Upper Arlington's Master Plan stresses the need for the City to create "new revenue" to "meet its current capital needs and support its current level of services," noting that "commercial office use provides significantly more revenue to the City than any other land use." Commercial office use is authorized on less than five percent of the City's land. And because Upper Arlington is landlocked and fully developed, the preservation of its office districts for commercial use is of utmost importance to the City. The Master Plan also singles out personal income taxes as "an important source of Upper Arlington's revenues" and emphasizes that "every effort will be made to broaden and expand the City's employment base in order to increase these tax revenues."
In keeping with the Master Plan's emphasis on commercial office use and the generation of income-tax revenue, the City's Development Ordinance specifies that office-district zones within the City are meant to "provide job opportunities and services to residents and contribute to the City's economic stability." Upper Arlington, Ohio, Unified Dev. Ordinance § 5.03(A)(6), https://library.municode.com/oh/upper_arlington/codes/code_of_ordinances?nodeId=PT11UNDEOR. Permitted uses within the office district include "business and professional offices, research and development, book and periodical publishing, insurance carriers, corporate data centers, survey research firms, bank finance and loan offices, outpatient surgery centers, [and] hospitals." Id. As previously noted, both secular and religious schools are specifically prohibited uses. Places of worship are conditional uses, meaning that they are permitted in *362 the office district, but only with approval from the Board of Zoning and Planning (the Board). Id. art. 5, tbl. 5-C.
Child daycare centers (hereinafter, "daycares") are also prohibited uses in the office district under the Development Ordinance as presently worded. Dev. Ordinance § 5.03(A)(6); id. art. 5, tbl. 5-C. But they were permitted prior to 2011, when the City Council amended the Ordinance to exclude them in response to this litigation. Upper Arlington, Ohio, Ordinance 52-2011 (Sept. 12, 2011). Chad Gibson, Upper Arlington's Senior Planning Officer, testified in a deposition that the City previously intended daycares to be an ancillary use in the office district, designed not to generate revenue but to "facilitate the general office district" by providing "a place where workers in the office complex could drop off their children during work hours in a safe environment." Although Gibson noted that "typically daycares are not massive in size," he acknowledged that the prior iteration of the Development Ordinance did not restrict their size, so a large daycare would have been a permitted use within the office district.
2. Tree of Life purchased property within the office district.
Tree of Life, a religious nonprofit corporation, operates a private Christian school that currently serves 532 students and has a workforce of 150 employees spread across three campuses throughout the Columbus, Ohio metropolitan area. The school believes that its lack of a unified campus inhibits its growth and limits its enrollment numbers. Accordingly, Tree of Life began searching in 2008 for a site where it could consolidate its campuses and serve a larger population of students.
In 2009, AOL/Time Warner, a media company that is not a party to this litigation, vacated a 254,000-square-foot office building-the largest in Upper Arlington-located on the Property. AOL/Time Warner generated significant revenue for Upper Arlington during the time that it occupied the Property through a combination of property taxes and income taxes levied on both the company and its employees. In 2001, for example, AOL/Time Warner accounted for 29% of all income-tax revenue collected by the City.
Tree of Life signed a purchase agreement for the Property in October 2009, and the sale was finalized in August 2010. The purchase agreement contained a contingency clause that allowed Tree of Life to cancel the purchase if, prior to the closing, it was unable to obtain Upper Arlington's approval for the rezoning of the Property to allow for the operation of a school. During the allotted time, Upper Arlington made no commitment to rezone the Property or otherwise authorize the operation of a school on the premises. Tree of Life nevertheless decided to move forward with the purchase.
3. Upper Arlington declined to accommodate Tree of Life's desire to operate a school on the Property.
Before acquiring the Property, Tree of Life filed a conditional-use application with Upper Arlington's Department of Development. The application stated that the property would be used as a church with an included school. The Board, however, rejected Tree of Life's characterization of its intended use of the Property, ruling that "the proposed primary use of the property as a private school does not constitute a 'place of worship, church' as that term is used in [the Development Ordinance], and is therefore not a conditional use in the [office district]." The City Council upheld the Board's decision. In a separate set of rulings, the Board and the City Council also rejected Tree of Life's argument that *363 a private school should be allowed as a permitted conditional use.
During the course of this litigation, Tree of Life submitted an application to the Department of Development to request that the Development Ordinance be amended to permit private religious schools to operate in the office district. Gibson, as Upper Arlington's Senior Planning Officer, prepared a staff report recommending that the City Council reject the amendment. Among other criticisms of the proposed amendment, the report concluded that allowing private religious schools "within the City's extremely limited commercial areas is simply not necessary or beneficial to the City, and it is likely that negative long-term economic consequences will result." Based on this recommendation, the City Council denied the proposed amendment.
Tree of Life next filed an application requesting that the Property be rezoned for residential use. Echoing the reasons for his opposition to Tree of Life's first proposed zoning amendment, Gibson issued a staff report urging the City Council to reject this second proposed amendment as well. The report noted that the northern boundary of the Property "has the greatest opportunity for intense office use" in Upper Arlington and that rezoning the Property for residential use would therefore "be contrary to the City's long-term financial interests." Based on Gibson's recommendation, the City Council rejected Tree of Life's second proposed amendment.
B. Procedural background
Tree of Life filed suit after Upper Arlington rejected its conditional-use application. The complaint alleged violations of (1) RLUIPA's substantial-burden and equal terms provisions; (2) the First Amendment's Free Speech, Assembly, Free Exercise, and Establishment Clauses; (3) the Fourteenth Amendment's Due Process and Equal Protection Clauses; and (4) Article 1, Section 7 of the Ohio Constitution. Tree of Life seeks both equitable relief to allow it to operate on the Property and compensatory damages for the harm that it has allegedly suffered as a result of Upper Arlington's refusal to accommodate the proposed school.
Shortly after filing suit, Tree of Life moved for a preliminary injunction based on its equal protection and RLUIPA equal terms claims. Although the district court found that Tree of Life was likely to succeed on the merits of its RLUIPA claim (but not on its equal protection claim), it concluded that the other preliminary injunction factors favored Upper Arlington. The court, after balancing all the factors, denied the motion.
Upper Arlington then filed a motion for summary judgment, arguing that the case was not ripe for adjudication because Tree of Life had not yet requested that the City rezone the Property to allow the school to operate there. The district court granted the motion, Tree of Life Christian Sch. v. City of Upper Arlington , 888 F.Supp.2d 883, 897 (S.D. Ohio 2012), and Tree of Life appealed to this court. While Tree of Life's appeal was pending, the school filed its first zoning-amendment application, prompting this court to remand the case to the district court. Tree of Life Christian Sch. v. City of Upper Arlington (Tree of Life I) , 536 F. App'x 580, 582-83 (6th Cir. 2013). Tree of Life filed its second zoning-amendment application following the remand.
On remand, both parties sought summary judgment, and the district court granted Upper Arlington's motion and denied Tree of Life's. Tree of Life Christian Sch. v. City of Upper Arlington , 16 F.Supp.3d 883, 904-05 (S.D. Ohio 2014).
*364 The court held that because Upper Arlington excludes both secular and religious schools from the office district, the City's land-use regulations do not violate RLUIPA's equal terms provision. Id. at 899-900. With respect to Tree of Life's other federal claims, the court held that they were all either abandoned or legally deficient. Id. at 894 n.4, 900-04. The court declined to exercise supplemental jurisdiction over Tree of Life's state-law claim. Id. at 904. Tree of Life then filed a second appeal.
This court held on the second appeal that the district court erred in granting summary judgment in favor of Upper Arlington on Tree of Life's RLUIPA equal terms claim. Tree of LifeSch. v. City of Upper Arlington (Tree of Life II) , 823 F.3d 365, 366 (6th Cir. 2016). According to the court, Tree of Life created a genuine dispute of material fact by making unrebutted allegations that other entities permitted within the office district are "similarly situated [to the school] with respect to maximizing revenue." Id. at 371. The case was therefore remanded for the purpose of answering two specific questions: (1) "Are there nonreligious assemblies or institutions to which the court should compare Tree of Life Christian Schools because they would fail to maximize income-tax revenue," and (2) "if so, would those assemblies or institutions be treated equally to [Tree of Life]?" Id. at 372.
On remand for the second time, the parties filed cross-motions for final judgment. Tree of Life argued, as it does in this third appeal, that daycares and partially used offices are similarly situated to the proposed school in terms of their minimal capacity to generate revenue for Upper Arlington. See Tree of Life Christian Sch. v. City of Upper Arlington , No. 2:11-cv-09, 2017 WL 4563897, at *9 (S.D. Ohio Oct. 13, 2017). Noting that the current version of the Development Ordinance does not permit daycares within the office district, the district court implied that Tree of Life's claim is moot if based on daycares as a comparator. Id. at *10. To avoid any possibility of Upper Arlington reverting to the prior iteration of the Ordinance, the court issued an injunction preserving the Development Ordinance's current ban on daycares in the office district. Id. at *16.
The district court alternatively held that daycares are not similarly situated to Tree of Life's proposed school. Id. at *13. In doing so, the court found that the analysis done by Upper Arlington's expert witness, Catherine Armstrong, was more persuasive than the analyses done by Tree of Life's expert witnesses. Id. Armstrong's report demonstrated that "a daycare located at the Property would generate seven times more tax revenue for the City than Tree of Life" would generate. Id.
The district court also held that "full use of one assembly or institution compared to the full use of another type of assembly or institution" is the proper lens through which to analyze RLUIPA equal terms claims. Id. at *14. Any other approach would be improper, according to the court, because a "city can set forth the regulatory purpose, but ... cannot demand full use of a property to realize that purpose." Id. Having rejected both uses proposed by Tree of Life as comparators, the court entered final judgment for Upper Arlington. Id. at *16. This timely appeal followed.
II. ANALYSIS
A. Standard of review
After the second remand, the parties agreed to file cross-motions for final judgment and waive any oral presentation of evidence. This effectively amounted to a bench trial based on (1) a waiver of a jury trial under *365 Rule 38(d) of the Federal Rules of Civil Procedure, and (2) a request that the court make findings of fact and conclusions of law based on a stipulated record pursuant to Rule (52)(a)(1). Our standard of review is thus controlled by T. Marzetti Co. v. Roskam Baking Co. , 680 F.3d 629, 633 (6th Cir. 2012) ("In an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo .").
B. Preliminary matters
1. Tree of Life's RLUIPA equal terms claim is the only one remaining.
In addition to its RLUIPA equal terms claim, Tree of Life initially brought several other claims. This court upheld the district court's grant of summary judgment in favor of Upper Arlington on Tree of Life's equal protection and free exercise claims and held that Tree of Life had abandoned its state-law claim. Tree of Life II , 823 F.3d at 373. Prior to the second appeal, the district court also granted summary judgment in favor of Upper Arlington on Tree of Life's claims under the First Amendment's Establishment, Free Speech, and Assembly Clauses and the Fourteenth Amendment's Due Process Clause. Tree of Life Christian Schools v. City of Upper Arlington , 16 F.Supp.3d 883, 902-04 (S.D. Ohio 2014). It further concluded that Tree of Life had abandoned its RLUIPA substantial-burden claim. Id. at 894 n.4.
This court did not address those rulings during the second appeal. See Tree of Life II , 823 F.3d at 373. Nor did Tree of Life argue in its brief in support of its motion for final judgment or in its briefing for this appeal that any of those claims remain pending. Among those abandoned claims is any challenge to the City's determination that Tree of Life is neither a church nor a place of worship, so the dissent's sua sponte resurrection of that argument strikes us as unwarranted. Dissenting Op. at 384-86. Accordingly, the only remaining claim in this lawsuit is the RLUIPA equal terms claim.
2. Mootness
During the second remand, the district court took the unusual step of sua sponte enjoining Upper Arlington from amending the Development Ordinance to once again permit daycares in the office district. Tree of Life Christian Sch. v. City of Upper Arlington , No. 2:11-cv-09, 2017 WL 4563897, at *10, *16 (S.D. Ohio Oct. 13, 2017). Upper Arlington argues that the permanent injunction moots Tree of Life's claim insofar as it depends on daycares as a comparator. But Tree of Life persuasively answers that the injunction does not moot its claim because, in addition to equitable relief, the school also seeks compensatory damages for the harm that it has allegedly suffered on account of Upper Arlington's refusal to accommodate the proposed school. See Brandywine, Inc. v. City of Richmond , 359 F.3d 830, 835-36 (6th Cir. 2004) (holding that a zoning amendment mooted the plaintiffs' claims for declaratory and injunctive relief, but not their claim for monetary damages).
Upper Arlington next contends that Tree of Life abandoned its money-damages claim by failing to present any evidence or argument on that issue below. The litigation up to this point, however, has focused exclusively on the issue of liability. And this court's second remand directed the district court to focus solely on whether comparators exist that Upper Arlington treats more favorably than Tree of Life. Tree of Life II , 823 F.3d at 372. Tree of Life thus cannot be faulted for failing to introduce evidence and press its money-damages claim when the litigation agenda set by both this court and the district court has been directed entirely to *366 the issue of Upper Arlington's alleged liability under RLUIPA. Accordingly, Tree of Life has not abandoned its money-damages claim; nor did the district court's permanent injunction moot it.
3. Whether Tree of Life has made out a prima facie case of a RLUIPA equal terms violation was not settled by the previous appeal.
Tree of Life in turn argues that this court has already held that the school has made out a prima facie case of an equal terms violation under RLUIPA. We disagree. This court remanded the case to the district court because the City had failed to meet its burden at the summary judgment stage of showing that none of the permitted uses in the office district would generate less revenue for Upper Arlington than Tree of Life would. Tree of Life II , 823 F.3d at 371 (holding that Tree of Life's allegations in its verified complaint "create a genuine issue of fact as to whether the government treats more favorably assemblies or institutions similarly situated with respect to maximizing revenue, unless the government can demonstrate that no assemblies or institutions could be similarly situated" (emphasis in original) ). In other words, because Upper Arlington did not refute the possibility of a viable comparator at the summary judgment stage, the remand afforded Tree of Life another opportunity put one forward.
4. The district court was not bound by its preliminary injunction conclusion that Tree of Life was likely to succeed on the merits of its RLUIPA equal terms claim .
When the district court denied Tree of Life's motion for a preliminary injunction, it concluded that the school was likely to succeed on the merits of its RLUIPA equal terms claim, although it noted that "the likelihood of success is not overwhelming." Tree of Life argues that the court's decision at the preliminary injunction stage predetermined that the school had made out a prima facie case, and therefore that the court erred when it subsequently concluded otherwise.
As Upper Arlington points out, however, "findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits." United States v. Edward Rose & Sons , 384 F.3d 258, 261 (6th Cir. 2004). And here, the district court denied Tree of Life's request for a preliminary injunction. The court therefore properly evaluated on a clean slate whether Tree of Life had presented a prima facie case after this court's second remand.
5. The Development Ordinance is facially neutral .
In response to our questioning at oral argument, counsel for Tree of Life contended that the school has not abandoned its position that the school constitutes a place of worship. This contention, however, will not be considered on appeal since it was not raised as an issue in Tree of Life's briefs. See United States v. Johnson , 440 F.3d 832, 845-46 (6th Cir. 2006) ("[A]n appellant abandons all issues not raised and argued in its initial brief on appeal." (citation omitted) ).
Moreover, the argument is pretermitted because this court has already held that the Development Ordinance is facially neutral and thus not subject to a facial challenge. Tree of Life II , 823 F.3d at 373. That determination was not simply an "off-hand comment" as characterized by the dissent, Dissenting Op. at 385 n.5, so the law-of-the-case doctrine controls. See Moody v. Mich. Gaming Control Bd. , 871 F.3d 420, 425-26 (6th Cir. 2017) (holding that, under the law-of-the-case doctrine, *367 "we generally will not, for prudential reasons, consider issues addressed by a prior panel" absent "exceptional circumstances"). Because no such circumstances are present here, the dissent's "facial inequality" argument, Dissenting Op. at 383-84, is foreclosed.
C. RLUIPA's equal terms provision
We now turn to the central issue before us. In its opinion in the second appeal, this court noted a disagreement among the circuits about how RLUIPA's equal terms provision should be applied. Tree of Life II , 823 F.3d at 369-70. The court declined, however, to "definitively choose among the various tests used by other circuits." Id. at 370. Doing so was not necessary because the court held that a genuine dispute of material fact precluded summary judgment no matter which test the court applied. Id. Because Tree of Life now appeals a final judgment, we must decide upon a framework for analyzing the school's claim. Fortunately, the differences among our sister circuits' approaches are less substantial than they appear to be at first glance.
1. A comparator must be similarly situated to the plaintiff with regard to the regulation at issue .
The Eleventh Circuit has determined that a prima facie case under RLUIPA's equal terms provision requires proof that "(1) the plaintiff [is] a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the [plaintiff] on less than equal terms, [compared] with (4) a nonreligious assembly or institution." Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County , 450 F.3d 1295, 1307-08 (11th Cir. 2006). Because this is a clear and persuasive statement of the equal term provision's statutory requirements, we adopt Primera Iglesia 's statement of the elements. Only the third and fourth elements are at issue in this case. The key disagreement among the circuits is about what constitutes a proper comparator for the purpose of analyzing these elements.
"In matters of statutory interpretation, we look first to the text and, if the meaning of the language is plain, then 'the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms.' " Wysocki v. Int'l Bus. Mach. Corp. , 607 F.3d 1102, 1106 (6th Cir. 2010) (quoting Lamie v. U.S. Trustee , 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ). But where a statute's text is ambiguous, we may consider "persuasive authority" such as "other statutes, interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed" in interpreting a disputed term. In re Carter , 553 F.3d 979, 986 (6th Cir. 2009).
RLUIPA's equal terms provision prohibits governments from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). This language provides no guideposts for what Congress meant by the term "equal." As the Seventh Circuit recognized in River of Life Kingdom Ministries v. Village of Hazel Crest , 611 F.3d 367 (7th Cir. 2010) (en banc), " 'equality' is a complex concept. The fact that two land uses share a dictionary definition doesn't make them 'equal' within the meaning of a statute." Id. at 371. Specifically, "equality," in the "mathematical or scientific" sense of the word, "signifies ... equivalence or identity," whereas in other contexts, the term connotes a "proper relation to relevant concerns." Id. Because the statute does not specify the basis upon *368 which religious and nonreligious land uses should be compared, we must seek to ascertain the type of comparison that Congress intended from other tools of statutory interpretation.
Did Congress intend for the statute to require municipalities to extend preferential treatment to religious entities? We think not. Such a requirement would be inconsistent with any definition of the term "equal," and it would likely run afoul of the First Amendment's Establishment Clause. See id. at 370 (noting that an interpretation of the equal terms provision that is "too friendly to religious land uses" might "violat[e] the First Amendment's prohibition against establishment of religion by discriminating in favor of religious land uses" (emphasis in original) ).
At the other end of the policy spectrum, one could plausibly read the equal terms provision in pari materia with the Fourteenth Amendment's Equal Protection Clause. A plaintiff bringing an equal protection claim must be "similarly situated" to a comparator in "all relevant respects." Paterek v. Village of Armada , 801 F.3d 630, 650 (6th Cir. 2015) (quoting United States v. Green , 654 F.3d 637, 651 (6th Cir. 2011) ). Tree of Life's claim would clearly fail under such a framework because the Development Ordinance excludes both secular and religious schools from the office district. Indeed, the district court held that Tree of Life's equal protection claim failed for this very reason. Tree of Life Christian Schools v. City of Upper Arlington , 16 F.Supp.3d 883, 900-01 (S.D. Ohio 2014).
Such a reading, moreover, would render the equal terms provision superfluous. Accordingly, no circuit employs such a cramped reading of the equal terms provision. See, e.g. , Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch , 510 F.3d 253, 266 (3d Cir. 2007) ("There is no need ... for the religious institution to show that there exists a secular comparator that performs the same functions."); Vision Church v. Village of Long Grove , 468 F.3d 975, 1003 (7th Cir. 2006) ("[U]nder RLUIPA['s] [equal terms provision,] a plaintiff need not demonstrate disparate treatment between two institutions similarly situated in all relevant respects, as required under equal protection jurisdiction ...."); Midrash Sephardi, Inc. v. Town of Surfside , 366 F.3d 1214, 1229 (11th Cir. 2004) ("[W]hile [RLUIPA's equal terms provision] has the 'feel' of an equal protection law, it lacks the 'similarly situated' requirement usually found in equal protection analysis.").
All of the circuits that have analyzed this issue have therefore taken a broader approach, with most holding that a comparator for an equal terms claim must be similarly situated with regard to the regulation at issue . See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma , 651 F.3d 1163, 1173 (9th Cir. 2011) ; Elijah Group, Inc. v. City of Leon Valley , 643 F.3d 419, 424 (5th Cir. 2011) ; River of Life , 611 F.3d at 371 ; Lighthouse Inst. , 510 F.3d at 266. The Third Circuit's approach, which compares entities in light of "the regulatory purpose," Lighthouse Inst. , 510 F.3d at 266 (emphasis omitted), differs slightly from the Seventh and Ninth Circuits' tests, both of which conduct the comparison in light of "accepted zoning criteria" advanced by the regulation, Centro Familiar , 651 F.3d at 1173 ; River of Life , 611 F.3d at 371. And the Fifth Circuit's approach, which evaluates comparators by reference to "the ordinance itself and the criteria by which it treats institutions differently," probably hews closer to the Third Circuit's approach than to the Seventh and Ninth Circuits' approach. See Elijah Group , 643 F.3d at 424.
*369 Although it agreed with the general thrust of the Third Circuit's approach, the Seventh Circuit was concerned that a focus on "regulatory purpose" might invite jurisdictions to justify discrimination with sham purposes. See River of Life , 611 F.3d at 371. " 'Purpose' is subjective and manipulable," the Seventh Circuit explained, "so asking about 'regulatory purpose' might result in giving local officials a free hand in answering the question 'equal with respect to what?' 'Regulatory criteria' are objective ...." Id.
The Seventh Circuit, however, offered no example of a regulatory purpose that a jurisdiction might assert as the basis for a zoning regulation that would not also be an accepted zoning criterion. And to the extent that municipalities might assert sham purposes to justify religious discrimination, that concern is addressed by the fact that all government classifications must satisfy rational-basis review. See City of Cleburne v. Cleburne Living Center , 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ("[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.").
We thus conclude that the Third, Seventh, and Ninth Circuits' RLUIPA decisions cited above represent the majority view, with their respective tests essentially the same. Our only concern is that neither the Seventh Circuit nor the Ninth Circuit directly explain what the phrase accepted zoning criteria actually means. In the context of their analyses, however, the word "accepted" appears to connote lawful or proper zoning criteria as opposed to unlawful ones. With this in mind, we believe that the phrase "legitimate zoning criteria" best captures the idea that the comparison required by RLUIPA's equal terms provision is to be conducted with regard to the legitimate zoning criteria set forth in the municipal ordinance in question.
The Eleventh Circuit, in contrast, strays from the majority view, at least when it comes to facial challenges to land-use regulations, by paying no heed to the regulatory purposes behind zoning policies. In Midrash Sephardi , the court held that "the relevant 'natural perimeter' for consideration with respect to RLUIPA's prohibition is the category of 'assemblies or institutions.' " 366 F.3d at 1230. Under this test, if a zoning ordinance permits a particular secular assembly or institution-say, a private club-within a zone, an excluded religious assembly or institution could invoke RLUIPA to secure an exemption from the ordinance, but an excluded secular assembly or institution-say, a union hall-could not. See id. at 1231 (holding that a municipality's allowance for private clubs within a zone meant that a house of worship must be permitted as well). The Seventh Circuit has criticized this test as conferring preferential treatment to religious assemblies and institutions. River of Life , 611 F.3d at 370-71.
Regardless, the Eleventh Circuit's unique and problematic test appears to apply only when the challenged regulation is discriminatory on its face. The ordinance at issue in Midrash Sephardi facially discriminated against religious institutions because it prohibited houses of worship in the town's business district and, unlike with other proscribed uses, barred such entities from seeking special-use exceptions. 366 F.3d at 1219 & n.3. In Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County , 450 F.3d 1295 (11th Cir. 2006), however, the Eleventh Circuit clarified that when considering facially neutral land-use regulations, a "plaintiff bringing an as applied Equal Terms challenge must present evidence that a similarly situated nonreligious comparator *370 received differential treatment under the challenged regulation." Id. at 1311 & n.11 (emphasis in original). And in Konikov v. Orange County , 410 F.3d 1317 (11th Cir. 2005) (per curiam), the Eleventh Circuit evaluated whether a comparator was similarly situated to a house of worship by considering whether permitted land uses had a "comparable community impact." Id. at 1327. Thus, when it comes to facially neutral land-use regulations, like the one at issue here, the Eleventh Circuit also requires that comparators be similarly situated with regard to the regulation at issue.
The Tenth Circuit, on the other hand, is an outlier even when it comes to facially neutral land-use regulations. Rather than evaluating whether a comparator is similarly situated to a religious entity by reference to the land-use regulation's purpose, the Tenth Circuit weighs whether the uses, despite not being "identical," exhibit "substantial similarities" that would allow "a reasonable jury to conclude that [the entities] were similarly situated." Rocky Mountain Christian Church v. Board of Cty. Comm'rs of Boulder Cty. , 613 F.3d 1229, 1236-38 (10th Cir. 2010).
This test, in our opinion, lacks the clear guideposts that the other circuits have adopted for examining whether a comparator is similarly situated to a religious entity. Because the test is not couched in terms of the land-use regulation's purpose, a court applying it must determine which differences between entities are salient and which are insubstantial. The test therefore introduces significant subjectivity into the application of the equal terms provision. Accordingly, we adopt the majority approach, as discussed in the Third, Seventh, and Ninth Circuits' cases set forth above, and reject the Tenth Circuit's test.
In doing so, we note the dissent's critique that we (and all the other circuit courts that have analyzed the "equal terms" issue) have improperly imported the words "similarly situated" into the text of RLUIPA. Dissenting Op. at 379 & n.1. We respectfully disagree. The concept of "similarly situated with regard to legitimate zoning criteria" is simply the most reasonable interpretation of the undefined statutory words "equal terms." And interpreting ambiguous statutory language is a core function of the courts. See United States ex rel. Jones v. Horizon Healthcare Corp. , 160 F.3d 326, 336 (6th Cir. 1998) ("Interpreting ambiguous statutory language, of course, is the bread-and-butter work of the federal courts."); cf. Marbury v. Madison , 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule.").
2. The plaintiff bears the burden of making out a prima facie case.
At times, Tree of Life seems to argue that Upper Arlington bears the burden of demonstrating that no conceivable permissible use in the office district is comparable to Tree of Life's proposed use. Contrary to Tree of Life's argument, however, RLUIPA's text makes clear that the plaintiff bears the initial burden of making out a prima facie case, and only if that precondition is satisfied does the burden of persuasion shift to the government. See 42 U.S.C. § 2000cc-2(b) ("If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of [RLUIPA's land-use provisions], the government shall bear the burden of persuasion on any element of the claim ....").
*371 Moreover, once a RLUIPA plaintiff makes out a prima facie case, the litigation battle must be waged on the terms set by the plaintiff. In other words, the government bears the burden to persuade the factfinder that the bases on which the plaintiff established its prima facie case are not supported by a preponderance of the evidence. See id. (setting forth RLUIPA's burden-shifting framework). But the statute does not impose upon the government the additional burden of conjuring up and disproving additional bases not put forward by the plaintiff that might, had they been offered, support the claim. See id.
Tree of Life's suggestion to the contrary stems from this court's statement in the second appeal that the school's allegations "create a genuine issue of fact as to whether the government treats more favorably assemblies or institutions similarly situated with respect to maximizing revenue, unless the government can demonstrate that no assemblies or institutions could be similarly situated." Tree of Life II , 823 F.3d at 371 (emphasis in original). But the court made this remark in the context of evaluating whether Upper Arlington had produced sufficient evidence to justify a grant of summary judgment in its favor; the court was not dealing with the initial burden that Tree of Life bears in making out a prima facie case.
D. Upper Arlington did not violate RLUIPA's equal terms provision.
Tree of Life argues that the asserted regulatory purpose for the exclusion of the school from the office district-revenue maximization-is not a legitimate zoning criterion, and that Upper Arlington's assertion of that regulatory purpose is pretextual. In addition, the school puts forward nonprofit daycares, partially used offices, and publishers as comparators that are similarly situated to Tree of Life in their minimal capacity to generate revenue. We will address each of these arguments in turn.
1. Revenue maximization is a legitimate regulatory purpose .
As mentioned above, the Seventh Circuit added the "accepted zoning criteria" gloss to the various tests put forward for evaluating equal terms claims. River of Life , 611 F.3d at 371 (emphasis omitted). That court specifically identified "generating municipal revenue" as a legitimate regulatory purpose that can be pursued by separating residential and commercial uses within a jurisdiction. Id. at 373. And the court held that the ordinance at issue there did not violate the equal terms provision because the city "created a commercial district that excludes churches along with community centers, meeting halls, and libraries because these secular assemblies, like churches, do not generate significant taxable revenue." Id. (emphasis in original). Tree of Life's argument is thus in conflict with the decision that adopted the "accepted zoning criteria" standard for its equal terms test.
In support of its position, Tree of Life cites cases that have rejected revenue maximization as a compelling state interest in the context of challenges under RLUIPA's substantial-burden prong. See Int'l Church of Foursquare Gospel v. City of San Leandro , 673 F.3d 1059, 1071 (9th Cir. 2011) ; Elsinore Christian Ctr. v. City of Lake Elsinore , 291 F.Supp.2d 1083, 1093 (C.D. Ca. 2003), rev'd and remanded on other grounds , 197 F. App'x 718 (9th Cir. 2006) ; Cottonwood Christian Ctr. v. Cypress Redev. Agency , 218 F.Supp.2d 1203, 1227-28 (C.D. Cal. 2002) ; see also 42 U.S.C. § 2000cc(a)(1) ("No government shall impose or implement a land use regulation in a manner that imposes a substantial *372 burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest."). But neither the Seventh nor Ninth Circuit has held that a regulation must further a compelling state interest in order to constitute an accepted zoning criterion. See Centro Familiar Cristiana Buenas Nuevas , 651 F.3d 1163, 1171-73 (9th Cir. 2011) ; River of Life , 611 F.3d at 371. Nor has Tree of Life cited any authority that supports such a proposition.
Tree of Life also cites several state-court cases that express skepticism about revenue generation as a proper regulatory purpose in certain contexts. See Griswold v. City of Homer , 925 P.2d 1015, 1023 n.9 (Alaska 1996) ; Bossman v. Village of Riverton , 291 Ill.App.3d 769, 225 Ill.Dec. 742, 684 N.E.2d 427, 432 (1997) ; Oakwood at Madison, Inc. v. Township of Madison , 117 N.J.Super. 11, 283 A.2d 353, 357 (N.J. Super. Ct. Law Div. 1971). But other state courts-including higher courts in some of the very states whose lower courts Tree of Life cites-have approved of revenue maximization through zoning policy. See Consol. Gov't of Columbus v. Barwick , 274 Ga. 176, 549 S.E.2d 73, 75 (2001) ("The City's stated interest in attracting revenue to the zoning district ... constitutes a 'legitimate end of government' by ensuring the prosperity of the City by attracting business to the [zoning district]" (quoting Craven v. Lowndes Cty. Hosp. Auth., 263 Ga. 657, 437 S.E.2d 308, 310 (1993) ) ); Napleton v. Village of Hinsdale , 229 Ill.2d 296, 322 Ill.Dec. 548, 891 N.E.2d 839, 854 (2008) ("It was reasonable and legitimate for Hinsdale to conclude that the continued vitality of its business districts required an appropriate balance between businesses that provide sales tax revenue and those that do not ...."); Ward v. Montgomery Twp. , 28 N.J. 529, 147 A.2d 248, 251-52 (1959) (holding that a township's securement of "a new source of income [that] would serve the general economic welfare ... through land use regulation will not warrant judicial condemnation as long as it represents an otherwise valid exercise of the statutory zoning authority").
Moreover, zoning is generally thought to be an area of "traditional state authority." Rapanos v. United States , 547 U.S. 715, 738, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006). We are accordingly loath to reject revenue maximization as a legitimate zoning criterion on the basis of a handful of state-court decisions that touch upon the issue. Providing such a national answer to a traditionally state and local issue runs counter to the principles of federalism.
2. Upper Arlington's assertion of revenue maximization as the purpose of the Development Ordinance is not pretextual.
Tree of Life next contends that revenue maximization is a pretextual explanation for the exclusion of schools from the office district because the Development Ordinance permits nonprofits in the district from which the city cannot collect property taxes or entity-level income taxes. See Ohio Rev. Code §§ 5709.07, .12; Upper Arlington, Ohio, Revenue & Fin. Code § 203.02(C)(12)(d), https://library.municode.com/oh/upper_arlington/codes/code_of_ordinances?nodeId=PT2REFICO_CH203INTAEFJA12016. But Upper Arlington need not tailor its zoning regulations to squeeze every last dollar out of the permitted uses within the office district to credibly claim that it has structured the Development Ordinance to generate more revenue than would be generated *373 without the restrictions. Moreover, Upper Arlington's 2001 Master Plan specifically identified the generation of personal-income-tax revenue as a zoning goal:
Income taxes are an important source of Upper Arlington's revenues and every effort will be made to broaden and expand the City's employment base in order to increase these tax revenues. ... Encouraging development that helps attract well-paying jobs will enhance the income base. These jobs will in turn generate a higher level of income tax revenues, some of which can be targeted for regular maintenance of the City's infrastructure.
Because Upper Arlington is able to collect personal income taxes from a nonprofit's employees, the Development Ordinance's allowance for nonprofit entities in the office district does not contradict the asserted purpose of the regulation. Nor does Tree of Life argue that the Development Ordinance has been ineffective in generating revenue for the City. As previously noted, the prior occupant of the Property, AOL/Time Warner, accounted for 29% of all personal-income-tax revenue collected by the City in 2001. Accordingly, Tree of Life cannot credibly argue that the asserted purpose of the Development Ordinance is pretextual.
3. Daycares are the only potentially valid comparator put forward by Tree of Life.
Tree of Life put forward only daycares and partially used offices as comparators in its brief in support of its motion for final judgment. On appeal, the school also adds publishers as comparators and briefly mentions that outpatient-surgery centers are comparable. But the school's expert witnesses limited their analyses of potential comparators to daycares. Without any evidence that any other land uses generate less revenue for the City than would Tree of Life, they cannot be the foundation of a prima facie case.
As for partially used offices, the district court persuasively explained why they are not an acceptable comparator:
[I]f a partial use is accepted as a valid comparator, then there can never be a case in which a city with the goal of maximizing revenue could ever prevail. A city can set forth the regulatory purpose, but a city cannot demand full use of a property to realize that purpose. Therefore, for purposes of the analysis of similar comparators, the Court finds it should look to the comparison of the full use of one assembly or institution compared to the full use of another type of assembly or institution.
Tree of Life Christian Sch. v. City of Upper Arlington , No. 2:11-cv-09, 2017 WL 4563897, at *14 (S.D. Ohio Oct. 13, 2017) (citations to the record and internal quotation marks omitted). Tree of Life argues that because the Development Ordinance does not set a floor for the number of workers that a user of land can employ, partially used offices are valid comparators.
But this argument could be used to undercut almost any regulatory purpose behind a land-use ordinance. All zoning decisions require the regulatory authority to project the effects that a particular land use will have on the municipality. A municipality seeking to maximize revenue must project the type of labor force that a particular land use will attract. Similarly, a municipality that is concerned about traffic congestion and noise pollution must project how each particular land use will impact those conditions.
Irrespective of the regulatory goal, however, a municipality cannot guarantee that its predictions will be borne out once its policies go into effect. But municipalities *374 cannot be faulted for zoning decisions that utilize the best data available to make good-faith predictions in the face of such inherent uncertainties. The assumption that, as a general matter, entities within an office district will operate at full capacity strikes us as an appropriate good-faith prediction.
Moreover, Tree of Life has offered no credible explanation for why an entity that requires only a small amount of square footage for its operation would choose to situate itself in (and pay for) a 254,000-square-foot building on a 16-acre tract of land. Tree of Life's only evidence that such a use might occur in the office district is that AOL/Time Warner used the Property at partial capacity as it wound down its operations there. But this short-term situation is clearly distinguishable from the City's long-term zoning goals.
We therefore conclude that the district court correctly assumed for the purpose of its analysis that regulators can reasonably contemplate full usage of property when making zoning decisions. Accordingly, daycares are the only potentially valid comparator that Tree of Life has put forward.
4. Tree of Life presented no evidence suggesting that nonprofit daycares are similarly situated to its proposed school in terms of their capacity to generate revenue.
Tree of Life retained two expert witnesses to make its case that nonprofit daycares are similarly situated to its proposed school in terms of their revenue-generating ability. Robert Siegel is an early-care and education consultant. Tree of Life asked him to estimate the number of employees required to operate a daycare located on the Property and the payroll that such a workforce would generate. The largest daycare with which Siegel was familiar serves 600 children. Accordingly, he based his estimates on the assumption that a daycare of that size would be housed at the office building on the Property. Siegel estimated that such a daycare would require 35,000 square feet of operating space.
He also determined that 170,000 square feet of the building on the Property is usable as a daycare. Thus, roughly 20% of the usable space on the Property would be devoted to the daycare that Siegel envisioned. Siegel noted, however, that the excess 135,000 square feet of usable space "opens [up] all types of possibilities that would stabilize the [daycare], greatly improve program quality, and offer a marketplace advantage." He listed several of these ideas, including a "gymnasium, indoor playground, several larger multi-purpose rooms, a nurses' office, parent lounge, cafeteria, teacher's only area, nursing room, additional conferencing space for parent meetings, or a training room." Siegel did not, however, offer any estimate for how much of the excess space those amenities might occupy.
According to Siegel, a workforce of 159 people would be needed to care for 600 children. And this estimate does not appear to account for staffing of any of the "possibilities" that Siegel envisioned for the excess 135,000 square feet of usable space because his budget chart does not list employees who would staff those areas. Siegel estimated that a workforce of 159 people would generate an annual payroll of $3,154,470.
Tree of Life retained its second expert witness, a business and financial consultant named Rebekah Smith, for the purpose of calculating the amount of income-tax revenue that various land uses on the Property would generate for Upper Arlington. Specifically, she estimated the amount of income-tax revenue that Tree of Life's proposed school and Siegel's hypothetical *375 daycare would generate. In doing so, she relied on the estimates of Tree of Life Superintendent Todd Marrah, who projected that the consolidated campus would serve 1,200 students with a workforce of 275 staff members, generating an annual payroll of $5,000,000, as well as Siegel's estimates noted above.
Smith estimated, based on those numbers, that Tree of Life employees would pay $125,000 annually in income taxes to the City. By comparison, she estimated that Siegel's hypothetical daycare would yield $83,987 in annual personal-income-tax revenue if operated as a for-profit entity and $78,862 if operated as a nonprofit entity. Smith concluded, based on those figures, that "Upper Arlington's tax benefit from the Tree of Life school operations would be better as compared" to Siegel's hypothetical daycare.
This analysis, however, is deeply flawed. It glosses over the partial use of the Property that Siegel's estimates reflect. Tree of Life paid AOL/Time Warner $26 per square foot for the 254,000-square-foot office building. One is hard-pressed to believe that a prudent operator of a daycare would pay approximately $5.7 million dollars for 219,000 square feet of excess space (254,000 square feet of total space minus 35,000 square feet for the hypothetical daycare) that would not be used as a daycare. (219,000 square feet of unused space x $26 per square foot ˜ $5.7 million).
The far more likely scenario is that the vast remainder of the office building would not remain vacant, but would be utilized by the landowner for productive uses other than the daycare. This would result in the Property as a whole cumulatively generating far more revenue for the City than Tree of Life would generate by itself. So an accurate picture of relative revenue-generating capacities cannot be ascertained simply by comparing the absolute amount of income-tax revenue that Tree of Life's full use of the Property would generate to the amount that would be yielded by the 35,000 square feet contemplated for Siegel's hypothetical daycare.
Upper Arlington's expert witness, Catherine Armstrong, provides a far superior basis for comparing the two entities. Armstrong, the City's former Director of Finance and Administrative Services, used actual data from the City to show how much tax revenue is yielded by various land uses that are permitted in the office district versus that produced by daycares. Rather than presenting this data in absolute terms, as Smith did, Armstrong calculated the amount of annual revenue per square foot generated by the various entities that she analyzed. This approach allows for an apples-to-apples comparison between entities of different sizes. Armstrong's data show that an existing for-profit daycare generates $4.77 in annual revenue per square foot for the City as compared to $0.62 per square foot that Tree of Life would generate. All other uses that she considered would generate revenue at even higher rates.
Not unreasonably, Tree of Life criticizes Armstrong's analysis because the daycare on which she based her calculations was a for-profit entity that paid property taxes and entity-level income taxes, whereas Tree of Life, as a nonprofit, would not pay either type of tax. But by combining the data in the reports generated by Siegel and Smith with the methodology used by Armstrong, an accurate comparison is possible.
As mentioned previously, Siegel's payroll estimate was based on 35,000 square feet of used space. Smith estimated that a payroll of the size estimated by Siegel would yield $78,862 in annual personal-income-tax revenue for the City from employees working at a nonprofit daycare.
*376 Those figures equate to $2.25 in annual revenue per square foot of used space, which is still more than three times the amount of revenue per square foot that Tree of Life would generate. That calculation is roughly the same as the amount of annual revenue per square foot that the daycare analyzed by Armstrong provides to Upper Arlington if one excludes the property taxes that the daycare pays ($9,300 in income taxes ÷ 3,919 square feet = $2.37 per square foot).
In sum, Tree of Life has not established a prima facie case under RLUIPA's equal terms provision because it has failed to identify a permitted land use that would generate a comparably small amount of revenue for the City. Even the largest daycare with which Tree of Life's own expert witness is familiar would use only 35,000 square feet of the existing 254,000 square feet of available space in the office building on the Property. The application of Armstrong's methodology to Siegel's and Smith's data leads to the inexorable conclusion that daycares generate far more revenue on a per-square-foot basis than Tree of Life would. Accordingly, the school's equal terms claim fails.
III. CONCLUSION
For all the reasons set forth above, we AFFIRM the judgment of the district court.
DISSENT