**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NEW HARVEST CHRISTIAN
FELLOWSHIP,
                *Plaintiff-Appellant*,

v.

CITY OF SALINAS,
                *Defendant-Appellee.*

No. 20-16159

D.C. No.
5:19-cv-00334-
SVK

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan G. Van Keulen, Magistrate Judge, Presiding

Argued and Submitted May 12, 2021
San Francisco, California

Filed March 22, 2022

Before:  Jacqueline H. Nguyen and Daniel P. Collins,
Circuit Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Rakoff;
Partial Concurrence by Judge Collins

---

    [*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

# SUMMARY**

## Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the City of Salinas in an action brought under the Religious Land Use and Institutionalized Persons Act by New Harvest Christian Fellowship, an evangelical church, alleging violations of the Act's substantial burden and equal terms provision.

New Harvest alleged that the City's zoning restrictions prohibited it from hosting worship services on the ground floor of its newly purchased building, which substantially burdened New Harvest's religious exercise and treated New Harvest on less than equal terms with nonreligious assemblies.

While the appeal was pending, New Harvest informed the Court that it was in the process of selling its building, with escrow set to close on May 25, 2021. Having received no indication from New Harvest that escrow did not close on that date, the panel assumed that New Harvest no longer maintained a legally cognizable interest in the building. The claims for declaratory and injunctive relief were therefore moot. New Harvest's claim for nominal damages, however, was sufficient to keep the case alive. Moreover, New Harvest sought compensatory damages for the money it spent on various associated building expenses.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that looking to the totality of the circumstances, New Harvest failed to demonstrate a substantial burden on its religious exercise. The panel held that three factual circumstances militated against a finding of substantial burden: (1) New Harvest could have conducted worship services in the building had it been willing to hold services on the second floor or reconfigure the first floor; (2) New Harvest was not precluded from using other sites within Salinas and at least one suitable property has come on the market during the course of this litigation; and (3) at the time it purchased the building, New Harvest was on notice that the zoning restrictions would prohibit it from conducting worship services on the first floor.

The panel next concluded that the City's Assembly Uses Provision, which prohibits religious and other assemblies from operating on the ground floor of buildings facing Main Street within the downtown area, facially violated the equal terms provision of the Religious Land Use and Institutionalized Persons Act (RLUIPA). The panel held that other nonreligious assemblies, such as theatres, which were permitted to operate on the first floor of the Main Street Restricted Area, were similarly situated to religious assemblies with respect to the City's stated purpose and criterion. Because the City prohibited New Harvest from hosting worship services on the ground floor of the Main Street Restricted Area but permitted theatres to operate on the ground floor in that area, it impermissibly treated religious assemblies on less than equal terms with nonreligious assemblies. The panel therefore concluded that the Assembly Uses Provision facially violated the equal terms provision of RLUIPA.

Concurring in part and concurring in the judgment, Judge Collins agreed that New Harvest failed to carry its

burden, in opposing summary judgment, to show that the land use regulation imposed a substantial burden on its religious exercise. But in reaching that conclusion, Judge Collins would rely on narrower grounds than did the majority. The record contained evidence that "a suitable property was available for sale" during the relevant time period and in Judge Collins' view New Harvest failed to present sufficient evidence that purchasing that property—which was a church—would have entailed substantial delay, uncertainty, and expense. Judge Collins wrote that were it not for the fact that plaintiff failed to establish that the alternative church property was not readily available and suitable, he would otherwise find a sufficient showing of a "substantial burden" to warrant a trial.

## COUNSEL

Kevin T. Snider (argued) and Matthew B. McReynolds, Pacific Justice Institute, Sacramento, California, for Plaintiff-Appellant.

Gregory R. Aker (argued), Thomas B. Brown, and Temitayo O. Peters, Burke Williams & Sorensen LLP, Oakland, California, for Defendant-Appellee.

Victoria Wong, Deputy City Attorney, Office of the City Attorney, San Francisco, California, for Amici Curiae League of California Cities and California State Association of Counties.

**OPINION**

RAKOFF, District Judge:

New Harvest Christian Fellowship ("New Harvest"), an evangelical church located in Salinas, California, appeals from the district court's entry of summary judgment in favor of the City of Salinas (the "City"), on the Church's "substantial burden" and "equal terms" claims brought under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq*. We affirm the district court's summary judgment as to the Church's substantial burden claim, but we reverse the district court's summary judgment as to the equal terms claim and remand for further proceedings consistent with this opinion.

## I.  Background[1]

In March 2018, New Harvest purchased the Beverly Building, a two-story building located on Main Street in downtown Salinas. After operating out of a rented building nearby for several years, New Harvest hoped to move to the more spacious Beverly Building, where it intended to host worship services on the first floor and build classrooms, offices, storage space, and a kitchen area on the second floor.

The Beverly Building, however, is located on Main Street in a part of downtown Salinas called the "Downtown Core Area." The Downtown Core Area is subject to certain zoning restrictions designed, among other things, to "[e]ncourage pedestrian-oriented neighborhoods where local residents and employees have services, shops,

---

[1] The material facts in this case are substantially undisputed. This summary draws from the district court opinion, *New Harvest Christian Fellowship v. City of Salinas*, 463 F. Supp. 3d 1027 (N.D. Cal. 2020).

entertainment, jobs, and access to transit within walking distance of their homes and workplace." Salinas Zoning Code § 37-40.290. The zoning code classifies the area in which the Beverly Building is located as "mixed use," which generally requires "religious assembl[ies]," like New Harvest, to obtain a conditional use permit to operate. *See id.* § 37-30.240, Table 37-30.110. The zoning code also specifically prohibits "[c]lubs, lodges, places of religious assembly, and similar assembly uses" from operating on the "ground floor of buildings facing Main Street within the Downtown Core Area." *Id.* § 37-40.310(a)(2). We refer to this latter zoning restriction as the "Assembly Uses Provision" and to the three blocks of Main Street subject to the Assembly Uses Provision as the "Main Street Restricted Area."[2]

Before New Harvest acquired the Beverly Building, the City advised the church that it would not be permitted to conduct worship services on the ground floor, because such a use would be inconsistent with Assembly Uses Provision.[3] Undeterred, New Harvest sought a zoning code amendment

---

[2] The zoning code also includes another provision that governs the contexts in which live entertainment is permitted in the Downtown Core Area. Salinas City Code § 37-40.310(a)(3). We have no need to address the parties' disputes concerning this provision, as we resolve this appeal on other grounds.

[3] The building that New Harvest presently rents is also located in the Main Street Restricted Area. New Harvest initially operated there under a series of conditional use permits granted before the adoption of the Assembly Uses Provision, the most recent of which, obtained in 2000, was granted only after New Harvest represented that it was "not looking for long term residence" but intended to "buy a permanent building or build elsewhere." The conditional use permit for the rented building has since expired, however, and New Harvest continues to operate there as a legal nonconforming use.

(to modify the Assembly Uses Provision to enable religious assemblies to operate on the ground floor of the Main Street Restricted Area) and a conditional use permit (to permit New Harvest, a religious assembly, to operate in the mixed use district). The City denied both of New Harvest's requests "based on" the Assembly Uses Provision. City staff, however, recommended that New Harvest submit a modified application that would maintain an active use, like a café or a bookstore, at the front of the ground floor facing Main Street while building the sanctuary toward the back. The City also amended the zoning code to ensure that New Harvest would be permitted to operate a café or a bookstore on the first floor of the Beverly Building. New Harvest declined to submit a modified application.

Instead, New Harvest filed suit, alleging violations of RLUIPA's equal terms and substantial burden provisions. New Harvest sought, among other remedies, injunctive relief, declaratory relief, nominal and economic damages, and attorneys' fees. After discovery, both sides sought summary judgment. The district court granted the City's motion and denied New Harvest's. This appeal followed.

While this appeal was pending, New Harvest informed the Court that it was in the process of selling the Beverly Building, with escrow set to close on May 25, 2021. Having received no indication from New Harvest that escrow did not close on that date, we assume that New Harvest no longer maintains a legally cognizable interest in the Beverly Building.[4]

---

[4] Under RLUIPA, a plaintiff has a cognizable interest in the regulated land "if the claimant has an ownership, leasehold, easement,

## II.  Discussion

We review an order of summary judgment de novo. *Guru Nanak Sikh Soc. of Yuba City v. County of Sutter*, 456 F.3d 978, 985 (9th Cir. 2006). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Before turning to the merits, we address justiciability.

### A.  Justiciability

Because New Harvest no longer has a cognizable interest in the Beverly Building, its claims for declaratory and injunctive relief are moot. *See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1167–69 (9th Cir. 2011) ("The church no longer owns the [relevant] building, so the city could not be required to issue a conditional use permit for the building to the church. Nor could the church be entitled to a declaration that a code provision and statute violate federal law, because they no longer affect the church.").

The appeal, however, is not moot. For one thing, New Harvest's claim for nominal damages is sufficient to keep the case alive. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). Moreover, New Harvest seeks compensatory damages for the money it spent applying for the conditional use permit, paying the Beverly Building's monthly mortgage, and paying property taxes that, according to New Harvest, were only assessed because the building was not

---

servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5).

used for religious worship. The City, therefore, may be liable for nominal and compensatory damages under RLUIPA, assuming that New Harvest proves a violation and damages.

## B. Substantial Burden Provision

The first operative provision of RLUIPA at issue in this case is the substantial burden provision. It provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). This provision applies, *inter alia*, if the challenged government action involves "individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C). The City's denials of New Harvest's applications constitute "individualized assessments." *See Guru Nanak*, 456 F.3d at 987.[5] New Harvest "bears the burden to prove the [City's]

---

[5] As mentioned, New Harvest sought and was denied both a zoning code amendment and a conditional use permit. It has been argued that only the latter should constitute an "individualized assessment" under the substantial burden provision of RLUIPA. *See* Katie M. Ertmer, Note,

denial of its application imposed a substantial burden on its religious exercise." *Id.* at 988. Only if New Harvest establishes that it has experienced a substantial burden does the burden shift to the City to show that its denial of the church's application is narrowly tailored to accomplish a compelling governmental interest. *See Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011).

We have explained that a substantial burden "must place more than inconvenience on religious exercise." *Id.* (quoting *Guru Nanak*, 456 F.3d at 988). Instead, a challenged land use regulation must impose a "significantly great restriction or onus upon [religious] exercise." *Foursquare Gospel*, 673 F.3d at 1067 (quoting *San Jose Christian Coll.*, 360 F.3d at 1034); *see also Guru Nanak*, 456 F.3d at 988–89. Our previous cases indicate that some factors we consider in determining the existence of a substantial burden include, but are not necessarily limited to, whether the government's reasons for denying an application were arbitrary, such that they could easily apply to future applications by the religious group; whether the religious group has ready alternatives available to it or whether the alternatives would entail substantial uncertainty, delay, or expense; and whether the religious group was precluded from using other sites in the city. *See San Jose Christian Coll.*, 360 F.3d at 1035–36;

---

*Individualized vs. Generalized Assessments: Why RLUIPA Should Not Apply to Every Land-Use Request*, 62 Duke L.J. 79, 98, 110–11 (2012). We have previously assumed, however, that the denial of a requested zoning code amendment could be an individualized assessment under RLUIPA. *See San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1027, 1033–36 (9th Cir. 2004) (considering RLUIPA claim related to denial of a re-zoning application, following prior approval of a conditional use permit). In any event, because the City does not raise the issue, we have no occasion to revisit it.

*Guru Nanak*, 456 F.3d at 989; *Foursquare Gospel*, 673 F.3d at 1067, 1070. These cases demonstrate that our approach to determining the presence or absence of a substantial burden is to look to the totality of the circumstances.

The City, however, asks us to adopt two bright-line rules. First, the City contends that the existence of feasible alternative locations for a church to conduct its worship forecloses a finding of substantial burden. Second, the City argues that there can be no substantial burden when, knowing of the restrictions against use of a property for worship purposes, a church proceeds with the purchase anyway. We decline to adopt either of these bright-line rules. The availability of alternative locations, although plainly relevant to the substantial-burden inquiry, does not necessarily foreclose a finding of substantial burden. That is, other circumstances may create a substantial burden even where an alternative location is technically available. *See Foursquare*, 673 F.3d at 1068. Likewise, that a religious group has imposed a burden upon itself by acquiring a property whose use is already restricted is relevant to but not dispositive of the substantial burden inquiry. A city's zoning code may be so restrictive that a religious group has no option other than to purchase a property where religious assembly is forbidden and hope that an accommodation will be made on its behalf.

Looking, then, to the totality of the circumstances, we agree with the district court that New Harvest has failed to demonstrate a substantial burden. That is so for three primary reasons, none of which alone is necessarily dispositive.

First, New Harvest has not shown that the Assembly Uses Provision precludes it from conducting worship services in the Beverly Building. The record reflects that

New Harvest could have reconfigured the first floor of the building both to hold religious assemblies and to comply with the zoning requirements applicable in the Downtown Core Area. But New Harvest declined to adopt the City's proposed modification to its plans for the first floor of the Beverly Building or otherwise reconfigure the first floor.[6] This stands in contrast to the plaintiff congregation in *Guru Nanak*, which we concluded had faced a substantial burden when it had "readily agreed to every mitigation measure" the government had proposed but was nonetheless denied the conditional use permit required to build the Sikh temple it proposed. 456 F.3d at 989. While the City's proposed reconfiguration of the Beverly Building's first floor might have resulted in a space that could fit only 208 seats rather than New Harvest's preferred layout that could fit 299 seats, New Harvest never proved that this difference in capacity would have imposed a "substantial burden." *San Jose Christian Coll.*, 360 F.3d at 1034 (internal quotation marks omitted).[7]

The Assembly Uses Provision also permits services on the second floor. New Harvest objected in proceedings

---

[6] New Harvest argues that the City's mitigation proposal "is unworkable because it contradicts the City's own zoning code." New Harvest, however, would have been free to apply for another zoning code amendment and conditional use permit incorporating the proposed modifications. Had the City denied applications after inviting New Harvest to file them, we would have been more likely to find a substantial burden. *See Guru Nanak*, 456 F.3d at 989 (finding a substantial burden where the city had a history of giving inconsistent reasons for denying a religious group's applications, thus "lessen[ing] the possibility that future applications [for a conditional use permit] would be successful").

[7] With either layout, New Harvest would have had greater seating capacity than the 160–175 seats that could fit in the congregation's rented facility.

before the City that using the second floor would not be "convenient" for worship services with live music because the second floor's lower ceiling results in worse acoustics. While it might be that limiting services to the second floor could amount to more than a mere inconvenience in another case, New Harvest has offered no evidence other than the conclusory testimony of its pastor that the second floor's nine-foot ceiling is too low for live music. In any event, even assuming *arguendo* that the second floor is acoustically suboptimal, New Harvest has not shown that the resulting inconvenience would be anything more than that—an inconvenience. *Id*.

Second, even if we were to conclude that it would be a substantial burden for New Harvest to conduct worship on the second floor or to remodel the first floor, New Harvest has not shown that it was precluded from using other sites within the City. Under the zoning code, New Harvest is free to conduct worship services in almost any area of the City outside of the ground floor of the Main Street Restricted Area. To the extent that New Harvest would need to apply for a conditional use permit for religious assembly in other parts of the City, there is no evidence that suggests the City would deny such an application. To the contrary, over the past fifty years, the City has granted all but one such application from a church, among more than 100 applications. There is accordingly no record here that any subsequent application from New Harvest would be "fraught with uncertainty," since the City has not exhibited the "inconsistent decision-making" and conflicting rationalizations for repeated denials that led us to find that the *Guru Nanak* congregation faced a substantial burden after it acquired a second property but was again denied zoning approval. 456 F.3d at 990–91.

Moreover, many properties have become available in Salinas since New Harvest represented that it was intending to look for a new location. But New Harvest did not take steps to acquire any of these properties. The parties disagree as to the time frame relevant to determining whether a suitable alternative property was available to New Harvest. But we need not resolve this issue because a suitable property was available for sale during the pendency of this litigation. Before the district court, New Harvest argued that this property was unsuitable because it would require congregants to make a U-turn on a highway in order to reach the property on the other side. New Harvest presented no evidence, however, showing that this feature would render the property unsuitable for its congregation's use. It did not show, for example, that the property was unsuitable because of "size, configuration, safety issues, or current uses." *See Foursquare Gospel*, 673 F.3d at 1068. Inconvenience alone is not a substantial burden.

Finally, New Harvest's wholesale failure of proof concerning available alternatives is more significant because New Harvest purchased a building that it knew at the time was subject to unique zoning restrictions that would preclude it from conducting worship services on the first floor. This, combined with New Harvest's failure to diligently pursue other suitable buildings that came on the market since it represented to the City that its stay at the rented building would be temporary, suggests that New Harvest's burden is at least partly of its own making.

These three factual circumstances—that New Harvest could have conducted worship services in the Beverly Building had it been willing to hold services on the second floor or reconfigure the first floor; that New Harvest was not precluded from using other sites within Salinas and that at

least one suitable property has come on the market during the course of this litigation; and that at the time it purchased the Beverly Building, New Harvest was on notice that the Assembly Uses Provision would prohibit it from conducting worship services on the first floor—all militate against a finding of substantial burden. None is necessarily dispositive on its own, but taking all the circumstances together, we conclude that New Harvest has not met its burden of showing that the Assembly Uses Provision imposes a "significantly great" restriction, rather than an inconvenience, on its religious exercise. *Foursquare Gospel*, 673 F.3d at 1067. We therefore affirm the district court's entry of summary judgment in favor of the City on New Harvest's substantial burden claim.

## C.  Equal Terms Provision

The other provision of RLUIPA that New Harvest claims the City has violated is the equal terms provision. It provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). We have previously identified four elements of an equal terms claim: "(1) there must be an imposition or implementation of a land-use regulation, (2) by a government, (3) on a religious assembly or institution," and (4) the imposition or implementation must be "on less than equal terms with a nonreligious assembly or institution." *Centro Familiar*, 651 F.3d at 1170–71. It is undisputed here that the City has imposed or implemented a land use regulation, that the City is a government, and that New Harvest is a religious assembly or institution. Thus, only the fourth element is at issue in this case: whether the Assembly Uses Provision

impermissibly treats religious organizations on less than equal terms with a nonreligious assembly or institution.

The equal terms provision contemplates both facial and as-applied challenges. It prohibits the government from "'imposing,' *i.e.*, enacting, a facially discriminatory ordinance or 'implementing,' *i.e.*, enforcing[,] a facially neutral ordinance in a discriminatory manner." *Elijah Group, Inc. v. City of Leon Valley*, 643 F.3d 419, 422 (5th Cir. 2011); *see also Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1308 (11th Cir. 2006) (describing "three distinct kinds" of equal term violations, including regulations that "facially differentiate[] between religious and nonreligious assemblies or institutions" and regulations that are "truly neutral" but are "selectively enforced against religious, as opposed to nonreligious assemblies or institutions"). Here, New Harvest alleges that the Assembly Uses Provision facially violates the equal terms provision because it permits certain nonreligious assemblies to operate on the ground floor of the Main Street Restricted Area while forbidding religious assemblies from doing the same.[8]

---

[8] New Harvest also purports to bring an as-applied challenge to the implementation of the Assembly Uses Provision. "The line between facial and as-applied challenges can sometimes prove 'amorphous.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019) (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012)). Such is the case here. Although the contours of New Harvest's as-applied challenge are murky, the argument appears to be that particular nonreligious assemblies, such as the Ariel Theatre, currently operating on the ground floor of the Main Street Restricted Area should have been precluded from doing so under the Assembly Uses Provision because they are "similar" to "clubs, lodges, [and] places of religious assembly." Because this provision's applicability, on its face, thus turns on the issue of whether other uses are "similar" to churches, New Harvest's facial and as-applied challenges

"As this is a facial challenge, we consider only the text of the zoning ordinance, not its application." *Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1176 (9th Cir. 2020). New Harvest bears the initial burden of "produc[ing] prima facie evidence to support a claim alleging a violation" of the equal terms provision. 42 U.S.C. § 2000cc-2(b). If New Harvest succeeds in doing so, the statute shifts the burden of persuasion to the government on "any element of the claim." *Id*.

To make out a prima facie case of facially unequal treatment, New Harvest must show that the Assembly Uses Provision draws an "express distinction" between religious assemblies and nonreligious assemblies. *See Centro Familiar*, 651 F.3d at 1171 ("[T]he express distinction drawn by the ordinance establishes a prima facie case for unequal treatment."). The Assembly Uses Provision does just that: it draws an express distinction between "[c]lubs, lodges, and places of religious assembly, and similar assembly uses," on the one hand, and all other nonreligious assemblies, on the other hand, with regard to permitted first-floor uses in the Main Street Restricted Area. Salinas City Code § 37-40.310(a)(2). Because the Assembly Uses Provision expressly excludes religious assemblies while permitting some nonreligious assemblies, New Harvest has established a prima facie case. *See Centro Familiar*, 651 F.3d at 1171 ("It is hard to see how an express exclusion of 'religious organizations' from uses permitted as of right by other [nonreligious] 'membership organizations' could be other than 'less than equal terms' for religious organizations."). Accordingly, the City has the burden of

---

are not meaningfully distinct. We therefore analyze it as a facial challenge.

persuasion on each element of the equal terms provision claim.[9]

To meet that burden with respect to the contested fourth element, the City must show that any nonreligious assembly permitted to operate on the first floor of the Main Street Restricted Area is not similarly situated to a religious assembly "with respect to an accepted zoning criteri[on]." *Centro Familiar*, 651 F.3d at 1173. The City, taking a

---

[9] Of course, a religious organization will face a more difficult challenge establishing a prima facie case where, unlike here, the challenged regulation does not expressly prohibit religious assemblies. Instructive is our recent decision in *Calvary Chapel*. In that case, a church purchased a plot of land in the Citrus-Vineyard (C/V) Zone of the Temecula Wine Country of Riverside County. 948 F.3d at 1174. The zoning ordinance neither expressly permitted nor excluded religious assemblies. Rather, in the C/V Zone, "vineyards, groves, crops, orchards, gardens, and pastures for raising livestock are all permitted as of right," while "[e]ighteen-hole golf courses, child day care centers, bed and breakfasts, country inns, hotels, restaurants, spas, cooking schools, wine sampling rooms, retail wine sale stores, and special occasion facilities are all permissible . . . upon approval of a plot plan." *Id.* at 1174. After the county declined to amend the zoning ordinance "to specifically permit churches in the C/V Zone," the church brought a facial challenge under RLUIPA's equal terms provision. *Id.* at 1175. The church argued that the zoning ordinance facially violated the equal terms provision by prohibiting religious assemblies, while permitting the above-mentioned nonreligious assembly uses. *See id.* We rejected that challenge, holding that the church failed to make out a prima facie case because, "[a]t least on the face of the ordinance, secular and religious places of assembly are treated the same." We explained that "[b]oth are permitted in the C/V Zone only if they meet the requirements of a 'special occasion facility,'" and "nothing in the text of the ordinance prevents churches from holding regular worship services or other religious assemblies in their special occasion facilities." *Id.* at 1176. Here, unlike *Calvary Chapel*, the challenged land-use regulation expressly prohibits religious assemblies from operating on equal terms with at least some nonreligious assemblies—a prima facie violation of the equal terms provision.

different view of the proper order of operations, argues that the burden should shift only after New Harvest identifies a similarly situated nonreligious assembly that is permitted to operate on the ground floor of the Main Street Restricted Area. Such an approach, however, is inconsistent with *Centro Familiar*, where we found that the ordinance's express exclusion of religious assemblies gave rise to the plaintiff's prima facie case, without requiring the plaintiff to point to similarly situated nonreligious comparators. *Id.* ("The burden is not on the church to show a similarly situated secular assembly, but on the city to show that the treatment received by the church should not be deemed unequal, where it appears to be unequal on the face of the ordinance."). Accordingly, we conclude that the similarly situated comparators come into play, in a facial challenge, only after the plaintiff has put forward sufficient evidence that the regulation makes an express distinction between religious and nonreligious assemblies.[10]

---

[10] A decade ago, we observed that the approaches of our sister circuits to facial challenges under RLUIPA's equal terms provision fell "roughly into two camps." *Centro Familiar*, 651 F.3d at 1169 n. 25. Since then, the split has only widened, and we now discern not two but three distinct approaches to facial challenges under the equal terms provision. One camp—which includes the Third and Sixth Circuits—requires that plaintiffs "put forward" similarly situated nonreligious assemblies in order to make a prima facie case. *See Tree of Life Christian Sch.'s v. City of Upper Arlington*, 905 F.3d 357, 373 (6th Cir. 2018); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 270 (3d Cir. 2007). The second camp, which includes this Circuit and the Fifth Circuit, makes it easier for the plaintiff to make out a prima facie case, requiring only that the plaintiff bring forward sufficient evidence that the challenged regulation makes an express distinction between religious and nonreligious assemblies, regardless of whether those assemblies are similarly situated. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 291–93 (5th Cir. 2012). Only after the

Since, as mentioned, New Harvest has established a prima facie case, the burden shifts to the City to show that any nonreligious assembly permitted to operate on the first floor of the Main Street Restricted Area is not similarly situated to a religious assembly with respect to an accepted zoning criterion. As the Fifth Circuit has observed, this is functionally a two-part test, requiring the government to establish: (1) that the zoning criterion behind the regulation at issue is an acceptable one; and (2) that the religious assembly or institution is treated as well as every other nonreligious assembly or institution that is "similarly situated" with respect to that criterion. *See Opulent Life*, 697 F.3d at 292–93.

Turning to the first element, one stated purpose of the Assembly Uses Provision is to encourage pedestrian-oriented neighborhoods. *See* Salinas Zoning Code § 37-40.290. New Harvest contends that the Assembly Uses Provision is not an acceptable zoning criterion because it does not further a "compelling interest." But, as the Sixth Circuit observed in rejecting a similar argument, there is no requirement that the criterion further a compelling interest; only an acceptable one. *See Tree of Life Christian Sch.'s*, 905 F.3d at 372. It is a closer question whether the City's choice to ban certain first floor uses is an acceptable means

---

plaintiff establishes a prima facie case does the burden shift to the government to show, among other potential rebuttals, that the religious and nonreligious assemblies are not, in fact, similarly situated. *See id.* In the final camp is the Eleventh Circuit, which, like this Circuit and the Fifth Circuit, does not require the plaintiff to put forward similarly situated nonreligious assemblies in order to make a prima facie case; however, under the Eleventh Circuit's approach, the government may carry its burden only by showing that the challenged provision survives strict scrutiny. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1231–32 (11th Cir. 2004).

of realizing its stated purpose to foster a pedestrian-friendly Downtown Core Area. We need not resolve this issue because, even if the zoning criterion is lawful, the City fails the second element of the two-part test.

We conclude that the City has failed to show that the Assembly Uses Provision treats religious assemblies on equal terms with nonreligious assemblies that are similarly situated with respect to an accepted zoning criterion. The City assumes throughout its briefing that the Assembly Uses Provision distinguishes between "private" and "public" assembly uses, prohibiting only the former from operating on the ground floor of the Main Street Restricted Area. The City suggests that private assembly uses, but not public assembly uses, "typically are open only to organization members and their guests, operate during limited hours and for most of the week are closed, and have 'blank facades' with no windows or windows with drawn shades or blinds." The Assembly Uses Provision itself, however, does not speak in terms of "public" and "private" assemblies. Instead, the provision prohibits three particular types of assembly uses—clubs, lodges, and places of religious assembly— along with "similar" assembly uses. Under the zoning code, clubs and lodges are fairly characterized as private assemblies. They are defined as "[m]eeting, recreational, or social facilities" that are "primarily for use by members or guests." Salinas Zoning Code § 37-10.270. Churches, however, are not fairly characterized as private assemblies because they are commonly open to the public and can attract substantial foot traffic. Indeed, some of the country's largest houses of worship, like New York's St. Patrick's Cathedral and Washington's National Cathedral, host hundreds of thousands of visitors annually, only a small

fraction of whom are members or guests of the church.[11] And, although not directly relevant in this facial challenge, New Harvest itself explains that its own services "are held open to the public and no one has ever been denied entry."

For that reason, we hold that other nonreligious assemblies, such as theatres, which are permitted to operate on the first floor of the Main Street Restricted Area, are similarly situated to religious assemblies with respect to the City's stated purpose and criterion.[12] Like many religious assemblies, including New Harvest, theatres are open only on certain days of the week and for certain portions of the day; they attract sporadic foot traffic around their opening hours; and while they have some regular patrons, they are also open to newcomers. Some patrons come from nearby; others drive miles to attend. When it comes to the "eyes on the street" effect, theatres generally do not have large windows facing the street with people visible inside.

Because the City prohibits New Harvest from hosting worship services on the ground floor of the Main Street Restricted Area but permits theatres to operate on the ground floor in that area, the City does not treat New Harvest as well as nonreligious assemblies similarly situated with respect to an acceptable zoning criterion. We therefore conclude that

---

[11] *See, e.g.*, Liam Stack, *With Tourists Gone, St. Patrick's Cathedral Pleads for Help*, N.Y. Times, July 19, 2020.

[12] Theatres are classified in the zoning code as "commercial recreation," *see* Salinas City Code § 37-10.270. They are permitted on the Main Street Restricted Area, with only a nondiscretionary site plan review required, so long as they are less than two thousand square feet in floor area; otherwise, a conditional use permit is required. *See id.* § 37-20.240, Table 37.30.110 & n. 6; *see also id.* § 37-60.270 (setting forth the nondiscretionary site plan review process).

the Assembly Uses Provision facially violates the equal terms provision of RLUIPA.

Even if the City had met its burden of showing that the Assembly Uses Provision treats New Harvest on equal terms with similarly situated nonreligious assemblies, *Centro Familiar* suggests that the City would need to make yet another showing: that the provision is "reasonably well adapted" to the accepted zoning criterion. *See* 651 F.3d at 1175. For this standard, which is less rigorous than strict scrutiny, *id*. at 1175, considerations of both over- and under-breadth are relevant. *Id*. at 1174–75. To be sure, we have not discussed, let alone applied, the "reasonably well adapted" test since we first articulated it in *Centro Familiar*, and we know of no other court that has done so. And because we find that the City's regulation does not treat religious assemblies on equal terms with similarly situated nonreligious assemblies, we need not pass on this test's continuing vitality today.

We briefly note, however, that applying the "reasonably well adapted" test to the Assembly Uses Provision provides further support for our holding. First, the Assembly Uses Provision, like the ordinance at issue in *Centro Familiar*, is overbroad because it "excludes not only churches, but also religious [assemblies] that are not churches." *Id*. at 1174. The zoning code defines "religious assemblies," as relevant here, to include "[f]acilities for religious worship and assembly, incidental religious education, meeting halls, gymnasiums, and similar uses." Salinas City Code § 37-10.270. Even if churches were properly characterized as private assemblies—and they are not—the Assembly Uses Provision would also operate to exclude other "religious assemblies" that would appear to foster the sort of vibrancy that the zoning code is purportedly designed to promote. For

example, the Assembly Uses Provision, as written, would bar a YMCA gymnasium from operating on the first floor in the Main Street Restricted Area, even as it permits an Equinox gymnasium from operating in the same place.[13]

Second, *Centro Familiar* teaches that courts should also look to non-assembly uses whose presence is inconsistent with a city's stated zoning criterion. 651 F.3d at 1174–75. The City's zoning scheme permits on the ground floor of the Main Street Restricted Area numerous uses, including government offices, funeral services, and laboratories, that do not appear to advance the City's vision for a vibrant downtown.[14] To be sure, these are non-assembly uses, so they are not directly relevant as nonreligious comparators for New Harvest. But their potential operation on the first floor of the Main Street Restricted Area "would have the same

---

[13] Both a YMCA and an Equinox would be classified as a "fitness center" under the zoning code. *See* Salinas Zoning Code § 37-10.300. They would be permitted in the Main Street Restricted Area with only a nondiscretionary site plan review so long as they are less than five thousand square feet in floor area; otherwise, a conditional use permit would be required. *See id.* § 37-30.240, Table 37-30.110 & n. 6. However, the Assembly Uses Provision would operate to bar the YMCA, but not an Equinox, from operating on the ground floor in the Main Street Restricted Area.

[14] *See* Salinas Zoning Code § 37-40.310 (defining the use classifications for the Downtown Core Area as those of the "underlying base district," with a small number of exceptions not relevant here); *id.* § 37-30.240, Table 37-30.110 (listing all use classifications in mixed use districts and providing that government offices, funeral services, and laboratories can operate in such districts, with only the nondiscretionary site plan review required).

practical effect" as a private assembly, undermining the City's vibrancy plan. *Id*. at 1174.[15]

RLUIPA, of course, does not prevent the City from crafting a zoning scheme that employs an accepted criterion in order to prohibit certain uses from operating on the ground floor of the Main Street Restricted Area. But the Assembly Uses Provision, as written, impermissibly treats religious assemblies on less than equal terms with nonreligious assemblies. In writing its zoning code, the City should have done and can do much better.

### III. Conclusion

Because the Assembly Uses Provision facially violates the equal terms provision of RLUIPA, we reverse. On remand, the district court should proceed as appropriate to adjudicate New Harvest's claims for damages and attorneys' fees.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

[15] Other uses, such as hospitals and cemeteries, are permitted as of right in those portions of the Downtown Core Area zoned as commercial office, residential high density, and public/semi-public, but are not permitted in the Main Street Restricted Area, which is zoned as mixed-use. These uses—although, again, not assembly uses—also call into question the City's consistency in implementing its vibrancy plan.

COLLINS, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the majority opinion except as to section II-B, and I concur in the judgment.

I agree that Plaintiff New Harvest Christian Fellowship failed to carry its burden, in opposing summary judgment, to present sufficient evidence to show that the land use regulations challenged here "impose[d] a substantial burden on the religious exercise" of Plaintiff and its members in violation of § 2(a)(1) of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc(a)(1). But in reaching that conclusion, I would rely on narrower grounds than does the majority.

We have indicated that a local government does not impose a "substantial burden" on religious exercise by enforcing a zoning restriction if the religious assembly has "ready alternatives" that do not "require substantial delay, uncertainty, and expense." *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1068 (9th Cir. 2011) (citation and internal quotation marks omitted). As the majority notes, the record here contains evidence that "a suitable property was available for sale" during the relevant time period, *see* Opin. at 14, and in my view Plaintiff failed to present sufficient evidence that purchasing that property—which was a church—would have entailed substantial delay, uncertainty, and expense.

In opposing summary judgment on this point, Plaintiff relied on a declaration from its real estate agent, who stated that, "[t]o get to this church building," which was "at the far north end of Salinas," "one must drive out of Salinas on Highway 101 North and make a U-turn on the highway to reach the building and campus heading back on Highway

101 South." That single sentence is simply too thin, without more, to support a reasonable inference that this available church property was not a suitable and ready alternative. Plaintiff had the burden of proof to show a "substantial burden" under RLUIPA, *see Foursquare Gospel*, 673 F.3d at 1067, and on that issue Plaintiff failed to "come forward with 'specific facts' showing that there is a genuine issue for trial." *Wade v. Regional Credit Ass'n*, 87 F.3d 1098, 1100 n.2 (9th Cir. 1996) (citation omitted). On that basis, I concur in the judgment affirming the district court's grant of summary judgment in favor of the City on Plaintiff's claim under § 2(a)(1) of RLUIPA.

I disagree, however, with the majority's suggestion that, in evaluating the issue of substantial burden, we should also give weight to two other alternatives—namely, (1) that Plaintiff reconfigure the first floor of the Beverly Building according to the City's demands; or (2) that Plaintiff use the second floor of that building for its congregational space. *See* Opin. at 11–13 & n.6. On this record, neither of these options presented a ready and suitable alternative. Indeed, were it not for the fact that Plaintiff failed to establish that the alternative church property was not readily available and suitable, I would otherwise find a sufficient showing of a "substantial burden" to warrant a trial.

In seeking summary judgment below, the City relied on its proposal that Plaintiff dedicate almost the entire street-facing portion of the first floor of the Beverly Building to a nearly 1,500-square-foot commercial space (*i.e.*, "retail, food service, office, or other pedestrian-oriented uses"), with the back portion of the first floor available for a 208-seat congregational space. But Plaintiff's pastor submitted a declaration stating that a 208-seating capacity would give the church "only about a dozen more seats" than the church's

existing location at the time it "purchased the Beverly Building"—which would thwart the plans for growth and evangelization that had led Plaintiff to acquire the Beverly Building in the first place. Plaintiff instead had proposed a much smaller 176-square-foot bookstore facing the street, which would allow a 299-person congregational space on the first floor of the Beverly Building, but the City rejected that proposal.

Taking Plaintiff's evidence as true, and drawing all inferences in favor of Plaintiff, I think that the record would permit a reasonable trier of fact to conclude that, by blocking the church's objectives for growth, the City's first-floor plan was not a suitable alternative and weighed in favor of finding a substantial burden on Plaintiff's religious exercise. In my view, the majority therefore errs in suggesting that Plaintiff should have "'readily agreed'" to what "the government had proposed." *See* Opin. at 12 (citation omitted). As the majority notes, what the City proposed would have reduced the seating capacity of the church's congregational space by more than 25%, *see id*., thereby thwarting the Plaintiff's plans for growth and evangelization. That is certainly a "burden" on Plaintiff's religious exercise, and the magnitude of that burden is plainly "substantial."

The majority further errs in endorsing, as an adequate alternative that weighs against a finding of substantial burden, the proposal that Plaintiff use the *second* floor of the Beverly Building for worship services. *See* Opin. at 12–13. As an initial matter, the majority's reliance on this second-floor alternative is surprising, because the City itself did not make this argument in its answering brief in this court. Although the City's brief mentioned that option in its statement of facts, the brief's legal analysis under RLUIPA did *not* contend that the second floor was a suitable

congregational-use alternative that defeated a showing of substantial burden.  Instead, the City argued that its *first-floor* congregational-use proposal would free up "the entire spacious second floor for use" by Plaintiff's *non-congregational activities*, such as its "youth ministries," as well as for "clerical offices, rehearsal rooms, storage, and administrative functions."          Moreover, the City's architectural expert below relied *only* on the proposal that the first floor be used for congregational services.

Furthermore, in suggesting that the Beverly Building's second floor would be a suitable space for "worship services," the majority improperly weighs the evidence and again makes arguments the City itself declined to make. *See* Opin. at 12–13.    Plaintiff's pastor's declaration below asserted that the second floor's low ceiling made it unsuitable for worship services, in which music was an important element:

> We could not place the sanctuary on the second floo[r] due to the low height of the ceiling which is 9'1".  Acoustically, this is too low for live music.  At 15'7" the ceiling on the ground floor is six and a half feet higher.

The majority discounts this concern as a mere "inconvenience" because, in its view, the pastor's testimony on this point is "conclusory." *See* Opin. at 12–13.  But one does not need a degree in acoustical engineering to know that the sound quality of music—involving musical instruments and potentially hundreds of people signing—will be substantially inferior in an otherwise very large room that has only the ceiling height of a standard living room.  The majority is effectively weighing the evidence itself, which we are not permitted to do on summary judgment.  Viewing

the record in the light most favorable to Plaintiff, consigning the church's congregation to the second floor would directly and substantially burden the conduct of Plaintiff's religious services—which is probably why the City never pressed the contrary view in this court.

For the foregoing reasons, I respectfully concur in part and concur in the judgment.